# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-3902

_____

United States of America,

               Appellee,

     v.

Steven D. Kiderlen,

               Appellant.

*
*
*
*    Appeal from the United States
*    District Court for the
*    Eastern District of Missouri.
*
*
*

_____

Submitted: June 9, 2008
Filed:  June 22, 2009

_____

Before LOKEN, Chief Judge, EBEL,[1] and COLLOTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

On December 15, 2005, a grand jury charged Steven Kiderlen with one count of transporting child pornography, in violation of 18 U.S.C. § 2252A(a)(1). Kiderlen's counsel moved to withdraw on June 26, 2006, and Kiderlen asked to proceed *pro se.* The district court[2] granted the motions, but later appointed new

_____

[1]The Honorable David M. Ebel, United States Circuit Judge for the 10th Circuit, sitting by designation.

[2]The Honorable Richard E. Webber, United States District Judge for the Eastern District of Missouri.

counsel, after Kiderlen was transferred to an out-of-state detention facility for psychiatric observation in September 2006. The court then held two competency hearings in March and April 2007, and determined that Kiderlen was competent to stand trial. In May 2007, Kiderlen's attorney requested leave to withdraw and remain as standby counsel, and Kiderlen again filed a motion to proceed *pro se*. The court granted the motions, and Kiderlen tried his own case before a jury. The jury found him guilty, and the district court sentenced him to 240 months' imprisonment. On appeal, Kiderlen argues that (1) he was not competent to stand trial, (2) he did not knowingly and voluntarily waive his right to counsel, (3) the verdict reached by the jury was not supported by sufficient evidence, (4) his sentence is unreasonable under 18 U.S.C. § 3553(a), and (5) his sentence violates the Eighth Amendment's ban on cruel and unusual punishment. We affirm.

I.

On June 1, 2004, a family services worker contacted the Lincoln County, Missouri, sheriff's office and advised the sheriff that a twelve year-old female, K.G., had saved sexually suggestive instant messages received from Kiderlen. The messages, dated May 29, 2004, indicated that Kiderlen had engaged in sexual encounters with three other minor females, and showed Kiderlen propositioning K.G. for sex. When the police visited Kiderlen's residence later that day, Kiderlen refused to consent to a search of his residence and declined to answer questions, but he did turn over a computer to the police.

On June 2, 2004, the police obtained and executed a search warrant for Kiderlen's residence, where they found three work stations with missing central processing units. After Kiderlen and his wife, Angela, arrived home, the police took the couple into custody. Angela told the police that she had helped Kiderlen destroy these computers and throw them in a ditch in a state park. Angela led police to the park, where they recovered the computers. The damage to the machines was so

extensive, however, that the police could not recover any data. The computer that Kiderlen had provided to the police three days earlier was his daughter's, and the hard drive did not contain pornography.

On that same day, K.G.'s mother told police that K.G. previously had received two e-mails from Kiderlen. The first e-mail contained eight images depicting pre-pubescent minors engaged in various sex acts. The second e-mail contained two web links entitled "Six Taking Shower" and "Nude Girls." K.G.'s mother attempted to access the web links on the second e-mail, but was unable to do so because a password was required. Police eventually conducted a forensic examination of K.G.'s mother's computer, discovering both e-mails and the sexually suggestive instant messages that K.G. received from Kiderlen. On December 15, 2005, Kiderlen was charged with transporting child pornography, in violation of 18 U.S.C. § 2252A(a)(1).

On June 26, 2006, Kiderlen's appointed counsel moved to withdraw, and Kiderlen asked to proceed *pro se*. The court warned Kiderlen that he would be held to the same standards as an attorney trained in the law, and suggested that Kiderlen accept a court-appointed standby counsel. But when Kiderlen persisted in his desire for self-representation, the court ultimately granted the motions. The court also made clear that it would appoint successor counsel upon Kiderlen's request.

At a status conference in September 2006, a magistrate judge reviewed the government's request that Kiderlen submit to a psychiatric evaluation to determine his competency to stand trial. The magistrate judge previously had granted a similar request, but Kiderlen refused to submit to an evaluation by a local psychiatrist. At the September conference, the magistrate judge again ordered a mental competency evaluation. Due to the "bizarre nature of some of the comments and statements [Kiderlen] made," the magistrate also recommended that the district court appoint counsel. The district court accepted the recommendation and appointed counsel to represent Kiderlen at all remaining proceedings before the court.

The psychiatrist who evaluated Kiderlen at Federal Medical Center in Butner, North Carolina, determined that Kiderlen was competent to stand trial. Kiderlen's counsel objected to the psychiatrist's report, and asked that a second evaluation be conducted by a doctor of Kiderlen's choosing. The government did not oppose this request, and the court granted the motion. When Kiderlen's chosen psychiatrist arrived, however, Kiderlen again refused to be evaluated, leaving only one complete psychiatric evaluation for consideration by the district court. Kiderlen's counsel identified this problem at the March 2007 competency hearing, and again expressed concern, based on his personal interactions with his client, about Kiderlen's competency. Counsel represented that Kiderlen could not meaningfully assist in preparing a defense, and that Kiderlen's actions suggested that additional psychiatric treatment was necessary before Kiderlen could stand trial. The court continued the hearing to allow the parties to call witnesses.

At the continuation of the competency hearing on April 17, 2007, the court heard testimony from Dr. Tanya Cunic, the only doctor able to complete a psychiatric evaluation of Kiderlen. Dr. Cunic opined that based on four hours of formal interaction with Kiderlen, she found him able to assist in his defense and competent to proceed. Dr. Cunic explained that Kiderlen appeared to ascribe to the Freeman Movement, a group of people who believe that President Franklin Roosevelt pledged the birth certificates of United States citizens as collateral for the United States debt. Members of the movement believe that the government is treating them as monetary collateral instead of human beings, and that a criminal indictment listing the name of a movement member in all capital letters is actually a suit against a fictitious corporation rather than the named person. Dr. Cunic explained that Freemen also do not recognize the authority of the courts.

Despite Kiderlen's unusual ideology, he discussed common topics with Dr. Cunic in a coherent fashion. Dr. Cunic noted that Kiderlen was very different from the ten other Freemen she had dealt with in the past. She observed that Kiderlen had

learned about the movement from someone in another jail facility, and that Kiderlen believed that subscribing to the Freeman movement was his best "defense" because it enabled him to weigh down the government with paperwork. Dr. Cunic took Kiderlen's understanding of the strategic benefits of subscribing to the Freeman Movement as evidence that Kiderlen was capable of meaningfully assisting in his defense. Dr. Cunic also noted that Kiderlen was able to speak rationally and interact appropriately, although at times he would choose not to do so.

In cross-examining Dr. Cunic, defense counsel elicited evidence that Kiderlen had expressed suicidal thoughts and superficially cut his arm with a razor on one occasion. Dr. Cunic testified, however, that these events were not necessarily indicative of mental illness. She later said that she felt Kiderlen understood the Freeman Movement and was able to employ it as a defense, but that he did not actually believe in the movement. In her written report, Dr. Cunic added that Kiderlen's request to proceed *pro se* should not be construed as evidence of mental illness, and that if Kiderlen chose to accept representation, then he would be able properly to assist an attorney in the defense of his case. The magistrate judge credited Dr. Cunic's report and testimony, and found that Kiderlen was competent to stand trial, stating:

> [Kiderlen has] a rational understanding of his current legal circumstances and the proceedings against him. He has the ability to consult with his lawyer and to provide meaningful information. If he does not do so, it is because he chooses not to do so.

Kiderlen moved for reconsideration, but the district court concluded that "every attempt has been made to ensure that Defendant is competent to stand trial," and denied the motion. The court found that further attempts to evaluate Kiderlen would not be fruitful, and set the trial for May 21, 2007.

As the trial date approached, Kiderlen again moved to represent himself, this time with standby counsel. After conducting a hearing that involved a colloquy with Kiderlen, the court granted the motion, and the case proceeded to trial on that basis. Kiderlen was found guilty by a jury. At sentencing, the district court calculated a sentencing range of 360 months' to life imprisonment under the advisory guidelines. Because the statutory maximum was 240 months' imprisonment, however, that term became Kiderlen's advisory guideline sentence. The court then considered the factors in 18 U.S.C. § 3553(a) and sentenced Kiderlen to 240 months' imprisonment.

II.

A.

On appeal, Kiderlen challenges the district court's finding that he was competent to stand trial. In determining whether an accused is competent to proceed, the district court must examine both whether the defendant has "a rational as well as factual understanding of the proceedings against him," and whether he "is able to assist properly in his defense." *United States v. Ghane*, 490 F.3d 1036, 1040 (8th Cir. 2007) (internal quotation omitted). We review the district court's finding of competency for clear error. *Id.*

As noted, the district court credited the opinion of Dr. Cunic and concluded that Kiderlen was competent. In challenging the court's finding on the first prong of the competency analysis, Kiderlen points to his outbursts in court and his conversations with defense counsel as evidence of irrational behavior and a general lack of understanding of the proceedings. He also suggests that the court placed too much emphasis on Dr. Cunic's report, and did not give sufficient weight to Kiderlen's past psychological problems. With respect to the second prong, Kiderlen claims that he was unable to assist in his defense because he was prone to mood swings and irrationality, and often became hostile and belligerent with his standby counsel for no

apparent reason. Kiderlen notes that he refused to speak to counsel at times, and that his counsel thought Kiderlen did not exhibit a full understanding of the "Freeman" concepts in his defense.

These arguments were aired before the district court, but the court accepted Dr. Cunic's view that Kiderlen's behavior was "a tactical and sophisticated response by [Kiderlen] to his current legal circumstances." Kiderlen's behavior and his counsel's impressions are relevant to the competency determination, but "bizarre, volatile, and irrational behavior" does not compel a finding of incompetence, *Vogt v. United States*, 88 F.3d 587, 591 (8th Cir. 1996) (internal quotations omitted), particularly where the evidence supports a conclusion that the accused is attempting to manipulate the criminal justice system. Dr. Cunic concluded from her interview that Kiderlen was "doing a balancing act between his understanding political and legal ideology from one subculture as well as understanding the political and legal terms of the current court." She reported that Kiderlen viewed the tactics of the Freeman movement as his best legal strategy. She saw nothing in his mental status or cognitive abilities that prevented Kiderlen from interacting appropriately with counsel, but predicted that he may refuse to communicate with counsel for tactical reasons.

There is no challenge to Dr. Cunic's qualifications, and while Kiderlen complains that Dr. Cunic did not conduct psychological testing, the evidence shows that Kiderlen refused her effort to administer the tests. Kiderlen relies on information concerning his psychological history gathered during the presentence process, but this information did not reflect a diagnosis that Kiderlen suffered from a mental disease that would render him incompetent for trial. In any event, Dr. Cunic's examination was more recent, and just as a "district court may rely on one of two competing competency opinions given by qualified experts," *Ghane*, 490 F.3d at 1040, it may also credit a recent psychiatric evaluation over older information, so long as its conclusion is supported by sufficient evidence. We see no clear error in the district

court's decision to credit Dr. Cunic's contemporaneous expert opinion and to conclude that Kiderlen was competent to proceed.

## B.

Kiderlen also argues that even if he was competent to stand trial, his decision to waive the right to counsel and proceed *pro se* was not knowing, intelligent, and voluntary. We review *de novo* the district court's decision to allow the defendant to waive his right to counsel. *United States v. Mahasin*, 442 F.3d 687, 691 (8th Cir. 2006).

The Sixth Amendment grants an accused both the right to counsel and the alternative right to proceed *pro se*. *Faretta v. California*, 422 U.S. 806, 807 (1975). To represent himself, an accused must "knowingly and intelligently" waive his constitutional right to counsel. *Id.* at 835. Because of "the enormous importance and role that an attorney plays at a criminal trial," the Supreme Court has "imposed the most rigorous restrictions on the information that must be conveyed to a defendant, and the procedures that must be observed, before permitting him to waive his right to counsel at trial." *Patterson v. Illinois*, 487 U.S. 295, 298 (1988). In *Faretta*, the Court said that "[a]lthough a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" 422 U.S. at 835 (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1942)). The Court upheld a waiver in *Faretta* where the record showed that the defendant was "literate, competent, and understanding," the trial judge had warned the defendant that the judge thought it was a mistake not to accept the assistance of counsel, and that the defendant would be required to follow all the rules of trial procedure. 422 U.S. at 808 nn. 2-3, 835-36.

In making the assessment of a waiver's validity, we look to the particular facts and circumstances in the case, including the background, experience, and conduct of the accused. *Meyer v. Sargent*, 854 F.2d 1110, 1114 (8th Cir. 1988). The "key inquiry," we have said, is "whether the accused was made sufficiently aware of his right to have counsel and of the possible consequences of a decision to forgo the aid of counsel." *Id.* (internal quotations omitted). We will uphold a district court's grant of a defendant's motion to represent himself "if the record shows either that the court adequately warned him or that, under all the circumstances, he knew and understood the dangers and disadvantages of self-representation." *United States v. Patterson*, 140 F.3d 767, 774-75 (8th Cir. 1998).

In this case, the district court discussed self-representation with Kiderlen at two separate hearings. On June 26, 2006, the court explained to Kiderlen that although he had a constitutional right to represent himself, "the problem is that you are held to the same standard as someone who has had a college degree, three years of law school, and trained in the law." The court told Kiderlen that he should not expect the court to "get involved" and "help the person" representing himself, and that Kiderlen would be "held to the same standard as an attorney representing herself or himself." The court also advised Kiderlen about the availability of "hybrid representation," where a court-appointed attorney is available for consultation, but Kiderlen told the court that he wanted "no type of lawyer whatsoever." The court then permitted Kiderlen to represent himself until September 2006, at which time the court appointed counsel for all remaining proceedings.

On May 7, 2007, Kiderlen presented a renewed request to serve as his own primary counsel, with an appointed attorney as co-counsel. Kiderlen made a lengthy statement objecting to the proceedings and asserting that the court lacked jurisdiction over him as a "sovereign man." The government urged the court to make a sufficient record that Kiderlen made a knowing and intelligent waiver, and specifically asked that the defendant be made aware of the dangers and disadvantages of self-

representation. The government requested in open court that Kiderlen be informed (1) that he was charged with transportation of child pornography, and that the range of punishment was from five to twenty years in prison, with a fine of up to $250,000, (2) that as a layperson, he would be unfamiliar with the rules of evidence or procedure, and that it was not the court's role to advise him or provide him with legal assistance, (3) that it would be difficult for him or any lay person to try a case without legal education and expertise, and that he would be best served by having a lawyer represent him, and (4) that he must accept the consequences of his decision, such that "if he represents himself pro se, he's not going to be able to claim later on that he wanted an attorney," or that any conviction should be overturned.

At that point, the court engaged in a colloquy with Kiderlen. The court explained that standby counsel would be seated at counsel table with Kiderlen, and be available to answer questions as the defendant saw fit. Kiderlen acknowledged that he understood. The prosecutor, at the court's direction, read the indictment and described the range of possible punishment. The court told Kiderlen that a person who represents himself is at a "natural disadvantage" because he lacks the skill and training of an attorney, and that the rules of procedure are "somewhat complicated." The court reiterated that it would not be allowed to assist Kiderlen, and that a person representing himself does so "at his own peril and at a very substantial disadvantage." The court told Kiderlen that his standby counsel was experienced and capable, and that Kiderlen's best interests would be served by accepting representation. The court also advised Kiderlen that any statements that he made while representing himself could be used against him as an admission, while an attorney could make statements that are not binding as admissions against a defendant, and that Kiderlen's appellate rights could be jeopardized by representing himself.

The court then inquired whether Kiderlen understood the court's advice about the perils and problems of self-representation. Kiderlen responded that he thought he understood the court's statements, but said he was confused by the prosecutor's

reading of the indictment, because it did not state "any type of liability." The court explained, however, that the indictment stated the offense charged, and Kiderlen agreed. The court then asked whether Kiderlen had any questions for the court. Kiderlen requested a copy of grand jury transcripts and a copy of the signed indictment, and the government agreed to furnish them. Kiderlen then stated that he had no further questions.

The record includes other information that is relevant to the validity of Kiderlen's waiver. Kiderlen was a high school graduate with one year of study at a business college. He had experience with the criminal justice system, having sustained fifteen convictions between 1990 and 2004. The district court had been presented with Dr. Cunic's psychological report, which indicated that Kiderlen was capable of formulating a sophisticated response to his legal situation. During the litigation, Kiderlen displayed knowledge of the trial process. Proceeding *pro se*, he submitted questions for voir dire and exercised strikes for cause and peremptory strikes. He raised objections at trial, some of which were sustained. He cross-examined witnesses, even prompting a compliment from the trial judge for establishing inconsistent statements, and he consulted with his appointed standby counsel during the trial.

We conclude that this record is sufficient to establish that Kiderlen's waiver of his right to counsel at trial was knowing, voluntary, and intelligent. The record reflects that the district court advised Kiderlen of the charges and penalties that he faced, and responded appropriately to questions that Kiderlen raised about them. Kiderlen first professed confusion about the indictment because it did not establish "liability," but then acknowledged his understanding that the indictment did state the offense charged against him. The court adequately warned Kiderlen about the dangers of self-representation during the colloquies on June 26, 2006, and May 7, 2007, by stressing at some length the complex duties of counsel in a criminal trial and recommending that Kiderlen accept representation by a trained attorney. Consistent

with *Faretta*, where the trial judge warned the defendant that he thought self-representation was a mistake and explained that the defendant would have to follow the rules of procedure, we have deemed warnings comparable to those administered here sufficient to establish a valid waiver. *See United States v. Abdul-Aziz*, 486 F.3d 471, 475 (8th Cir. 2007); *United States v. Mentzos*, 462 F.3d 830, 838 (8th Cir. 2006); *Mahasin*, 442 F.3d at 691; *Patterson*, 140 F.3d at 775. Kiderlen's performance at trial and his consultation with standby counsel further demonstrate that he was able to grasp the charges against him, appreciate the consequences of his decision to proceed *pro se*, and recognize his right to enjoy the assistance of counsel when it was desired.

Citing *Wilkins v. Bowersox*, 145 F.3d 1006 (8th Cir. 1998), Kiderlen contends that the waiver was invalid, because the district court did not ensure that he understood the charge against him, did not explain possible defenses or lesser included offenses, and did not conduct an in-depth inquiry into his background, personal characteristics, and mental health. *Wilkins* was an unusual case involving a defendant who participated in a robbery and murder at age sixteen. *Id.* at 1108. He was tried in state court as an adult, and informed the court that he wanted to waive his right to counsel and proceed *pro se*, "because he desired to receive a death sentence and his lawyer would not help him get the death penalty." *Id.* at 1009. After the trial court conducted "brief questioning" and encouraged Wilkins to accept the assistance of counsel, the court accepted *pro se* guilty pleas and eventually sentenced Wilkins to death. *Id.* at 1009-10. This court concluded that "[g]iven the combination of Wilkins's young age and the record evidence of his severely troubled childhood, the state trial court's colloquy with Wilkins was far from the kind of in-depth inquiry that is necessary to ensure a valid waiver of counsel." *Id.* at 1013. We further concluded that "the evidence overwhelmingly indicates that Wilkins's state of mind precluded him from making a valid waiver of counsel," *id.*, noting the "uncontroverted testimony" of several doctors that Wilkins's decisions to waive the right to counsel

and plead guilty "were the product of his mental illness and immaturity and not rational decision making." *Id.* at 1014.

In the course of discussing the adequacy of the trial court's inquiry, *Wilkins* relied on the plurality opinion in *Von Moltke v. Gillies*, 332 U.S. 708 (1948), which expressed the view that a valid waiver must be made with "an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter." *Id.* at 724 (plurality opinion). We gave weight in *Wilkins* to the fact that the state court did not explain possible defenses to charges, lesser included offenses, or the full range of possible punishments, and took no account of Wilkins's upbringing, which involved severe child abuse, drug abuse, and several stays in mental health facilities by the age of ten. 145 F.3d at 1012-13.

Neither the Supreme Court nor this court, however, has adopted the *Von Moltke* plurality opinion in all of its particulars, and we reject Kiderlen's contention that a waiver of the right to counsel must exhibit all of the features discussed in *Wilkins* before it is deemed knowing and voluntary. As noted, the waiver deemed valid in *Faretta* itself, as well as those in *Abdul-Aziz*, *Mentzos*, *Mahasin*, and *Patterson*, were effected without discussion between the trial court and the defendant of such matters as lesser included offenses, defenses to the charges, and mitigating circumstances that might be presented to the jury. Our decision in *Meyer v. Sargent*, 854 F.2d at 1114, even upheld a waiver of counsel without a specific warning about the disadvantages of self-representation, where other evidence showed that the defendant had the necessary knowledge of the dangers and disadvantages of self-representation, and the record indicated that the motion to proceed *pro se* was an obstructionist tactic employed by the defendant during trial. *Id*. at 1114-15. *Wilkins*, therefore, is best understood as a case-specific application of the general principle that our assessment of a waiver depends "upon the particular facts and circumstances surrounding that

-13-

case, including the background, experience, and conduct of the accused." *Meyer*, 854 F.2d at 1114.

In this case, the court already was aware through its inquiry into mental competency that Kiderlen intended to employ an unorthodox defense based on the Freeman movement, and the court reasonably credited expert testimony that Kiderlen's choice was a tactical and sophisticated response to his legal situation. The substance of the colloquy carried out by the district court has passed muster in a number of our prior cases, and we do not think the circumstances here required more. We are satisfied that the district court adequately warned Kiderlen of the dangers of self-representation, and that Kiderlen understood them. We agree with the district court that Kiderlen's waiver of the right to counsel was knowing, voluntary, and intelligent.

C.

Kiderlen next argues that his conviction for transporting child pornography was not supported by sufficient evidence. Kiderlen claims that the prosecution failed to establish beyond a reasonable doubt that he was the person who sent the e-mails containing pornographic images to K.G. We must view "the evidence in the light most favorable to the government, . . . accepting all reasonable inferences drawn from the evidence that support the jury's verdict," and we will overturn a verdict only if "no reasonable jury could have found the accused guilty beyond a reasonable doubt." *United States v. Ellefson*, 419 F.3d 859, 862-63 (8th Cir. 2005) (internal quotations omitted).

The statute under which Kiderlen was charged, 18 U.S.C. § 2252A(a)(1), applies to any person who knowingly transports or ships any child pornography in interstate or foreign commerce by any means, including by computer. The prosecution's case centered on an e-mail received by a minor, K.G., from a sender

identified as "kiddreamer1226," which contained eight images of minors engaged in sexual activity. Kiderlen asserts that there was insufficient proof that he sent the e-mail.

We conclude that the evidence was sufficient to support the conviction. K.G. testified that Kiderlen told her on the telephone on Saturday, May 29, 2004, that he had sent her an e-mail with photographs that included a minor engaged in sexually explicit activity. K.G.'s mother accessed K.G.'s account and located an e-mail from "Steven and Angela Kiderlen Construction, LLC; kiddreamer1226@DirecWay.com," which included eight attached images that depicted minors engaged in sexually explicit conduct. A search of Kiderlen's residence located a billing statement from DirecWay in Kiderlen's name for an account in the name of "kiddreamer1226." Kiderlen's wife testified that after law enforcement officials expressed interest in searching Kiderlen's computers, but before the search took place, Kiderlen destroyed the hard drives from two home computers and disposed of them. This evidence was more than sufficient to support a conclusion that Kiderlen sent the e-mail containing child pornography to K.G.

D.

Finally, Kiderlen challenges his sentence of 240 months' imprisonment. Although this term was the advisory guideline sentence, Kiderlen contends that it is substantively unreasonable under 18 U.S.C. § 3553(a). The district court explained that it had considered all of the factors in § 3553(a), observed that the nature and circumstances of the offense were "quite aggravated," and cited Kiderlen's "long history of criminal behavior," which resulted in twice the number of criminal history points required to place a defendant in category VI under the guidelines. The court concluded that the sentence must be substantial to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence to any further criminal conduct by Kiderlen, and to protect the public from

-15-

further crimes of Kiderlen. In sum, the court found "no basis . . . to impose anything but a guideline sentence in this case."

Kiderlen complains that the applicable sentencing guideline, USSG § 2G2.2, should be afforded "less deference and weight than other Guideline sections when fashioning a reasonable sentence," because it is the product of congressional direction in the PROTECT Act, Pub. L. No. 108-21, § 401(i), 117 Stat. 650, 673 (2003), rather than the Sentencing Commission's application of empirical data and national experience. He further contends that the advisory guidelines unreasonably establish a greater offense level for trafficking in child pornography than for such offenses as traveling to engage in a prohibited sex act with a minor, USSG § 2G1.3, or aggravated sexual abuse, *see United States v. Kane*, 470 F.3d 1277, 1282 (8th Cir. 2006).

We are not persuaded that the sentence imposed is substantively unreasonable. The Supreme Court has held that a court of appeals may apply a presumption of reasonableness to a sentence within the advisory guideline range, because such a presumption "recognizes the real-world circumstance that when the judge's discretionary decision accords with the [Sentencing] Commission's view of the appropriate application of § 3553(a) in the mine run of cases, it is probable that the sentence is reasonable." *Rita v. United States*, 551 U.S. 338, 350-51 (2007). It is true that USSG § 2G2.2 is the product of congressional direction rather than the empirical approach described by *Rita*. 551 U.S. at 348-49. The upshot is that the sentencing judge's discretionary decision under § 3553(a) in this case accords with *Congress'* view of the appropriate application of § 3553(a) in the mine-run case, rather than with the Commission's independent view of the matter. We are inclined to think, however, that in the real-world circumstance where a sentencing judge agrees with Congress, then the resulting sentence is also probably within the range of reasonableness.

But even applying our independent view, without regard to any presumption, we conclude that the district court selected a reasonable sentence. The court noted the

aggravated nature of Kiderlen's offense, which included a pattern of activity involving the distribution to a minor, by computer, of child pornography involving prepubescent minors engaged in sadistic or masochistic conduct. The court also found that Kiderlen admitted to his wife that he had molested three minor girls. (S. Tr. 68). And the court relied on Kiderlen's extensive criminal history, which registered a criminal history score of 30 points under the guidelines. Particularly under the deferential abuse of discretion standard of review that we must apply, these factors were sufficient under § 3553(a) to justify the statutory maximum punishment of 240 months' imprisonment.

Kiderlen also argues that his sentence violates the constitutional prohibition against cruel and unusual punishment, because it is disproportionate to the crime. *See Ewing v. California*, 538 U.S. 11, 20-24 (2003). The Eighth Amendment "forbids only extreme sentences that are grossly disproportionate to the crime," *id*. at 23 (internal quotations omitted), and a term of twenty years for an offender with Kiderlen's offense conduct and criminal history does not cross that threshold. The distribution of child pornography is "a grave offense" that victimizes the children depicted in the pictures, *United States v. Weis*, 487 F.3d 1148, 1153 (8th Cir. 2007), and Kiderlen's distribution is aggravated by his effort to send the images to a minor, his admission of previous sexual contact with three other minor girls, and his numerous prior criminal convictions. The Eighth Amendment does not proscribe the punishment authorized by Congress and selected by the district court.

\*      \*      \*

The judgment of the district court is affirmed. Kiderlen's several pending *pro se* motions are denied.

_____