Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/01/2022 08:08 AM CDT

STATE OF NEBRASKA, APPELLEE, V.
ANDRES SURBER, APPELLANT.
___ N.W.2d ___

Filed April 8, 2022.    No. S-20-856.

1. **Courts: Trial: Mental Competency: Appeal and Error.** The question
   of competency to stand trial is one of fact to be determined by the court,
   and the means employed in resolving the question are discretionary with
   the court. The trial court's determination of competency will not be dis-
   turbed unless there is insufficient evidence to support the finding.
2. **Trial: Evidence: Appeal and Error.** To conduct harmless error review,
   an appellate court looks to the entire record and views the erroneously
   admitted evidence relative to the rest of the untainted, relevant evidence
   of guilt.
3. **Trial: Pleas: Mental Competency.** A person is competent to plead
   or stand trial if he or she has the capacity to understand the nature
   and object of the proceedings against him or her, to comprehend his
   or her own condition in reference to such proceedings, and to make a
   rational defense.
4. **Trial: Mental Competency.** The competency standard includes both (1)
   whether the defendant has a rational as well as factual understanding of
   the proceedings against him or her and (2) whether the defendant has
   sufficient present ability to consult with his or her lawyer with a reason-
   able degree of rational understanding.
5. **Mental Competency.** There are no fixed or immutable signs of incom-
   petence, and a defendant can meet the modest aim of legal competency,
   despite paranoia, emotional disorders, unstable mental conditions, and
   suicidal tendencies.
6. **Courts: Trial: Mental Competency.** The question of competency to
   stand trial is one of fact to be determined by the district court.
7. **Courts: Trial: Mental Competency: Appeal and Error.** A court's
   decision regarding competency will not be disturbed absent insufficient
   evidence to support that finding.

8. **Mental Competency.** A defendant with voluntary control to cooperate is not incompetent simply because he or she refused to cooperate, refused to communicate with defense counsel, or could not get along with or disapproved of defense counsel.

9. ____. Even identifying with bizarre legal theories, whether or not sincerely held, does not automatically suggest incompetence.

10. **Trial: Evidence: Waiver.** The introduction of evidence by the defense waives any objection to the earlier introduction of evidence on the same subject by the State.

11. **Trial: Verdicts: Appeal and Error.** Harmless error review looks to the basis on which the trier of fact actually rested its verdict; the inquiry is not whether in a trial that occurred without the error a guilty verdict would surely have been rendered, but, rather, whether the actual guilty verdict rendered in the questioned trial was surely unattributable to the error.

12. **Trial: Evidence: Appeal and Error.** Erroneous admission of evidence is harmless error and does not require reversal if the evidence is cumulative and other relevant evidence, properly admitted, supports the finding by the trier of fact.

13. **Verdicts: Evidence: Appeal and Error.** Overwhelming evidence of guilt can be considered in determining whether the verdict rendered was surely unattributable to the error, but overwhelming evidence of guilt is not alone sufficient to find the erroneous admission of evidence harmless.

Appeal from the District Court for Dakota County: Bryan C. Meismer, Judge. Affirmed.

Todd W. Lancaster, of Nebraska Commission on Public Advocacy, for appellant.

Douglas J. Peterson, Attorney General, and Nathan A. Liss for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, and Papik, JJ., and McManaman, D.J.

Heavican, C.J.

## INTRODUCTION

Andres Surber was convicted of first degree murder, use of a firearm to commit a felony, and possession of a firearm by

a prohibited person. On appeal, Surber challenges the district court's conclusion that he was competent to stand trial. Surber also assigns as error that the court erred in admitting certain evidence, because it was obtained in violation of his Fourth Amendment rights. We affirm.

## BACKGROUND

### Disappearance and Discovery of Kraig Kubik

The victim in this case, Kraig Kubik, lived in rural Emerson, Nebraska. He was last seen alive by his girlfriend, Jaclyn Mahr, at approximately 7 p.m. on November 1, 2016. When Mahr left Kubik's home, Kubik and his 6-year-old son were at the home. Surber and Brayan Galvan had been at Kubik's home earlier that afternoon. Mahr last received a text message from Kubik at around 10:30 p.m., after which time he stopped responding to her texts.

The next morning, November 2, 2016, Mahr dropped her child off at school. She then went to Kubik's house, arriving there around 9 a.m. Upon her arrival, Mahr saw Kubik's son on the deck when he should have been at school. She also noted air compressors, which had not been there previously, located near a red Dodge Charger that was being stored on the property, as well as boots, a flashlight, and what appeared to be blood. Kubik was nowhere to be found.

Mahr took Kubik's son to school and returned to Kubik's house. She called some of Kubik's friends to see if they had seen him, and finally, she looked at footage from Kubik's home surveillance system. That footage showed Surber and Galvan on Kubik's property at 10:30 p.m. Kubik, Surber, and Galvan were seen on the footage walking toward the red Dodge Charger, then headlights of a vehicle could be seen backing out of the driveway.

After Kubik's son had been dropped off at school, he reported to his teacher that his father was dead and that "black cat" had killed him. Kubik's son also told his teacher that

there was blood on his father's boots and on a flashlight. When questioned by the principal, Kubik's son repeated the same information and also mentioned a gun and an air compressor. The principal attempted to get ahold of Kubik, but could not reach him, so he called police to conduct a welfare check.

A welfare check was conducted by the Dakota County sheriff. At Kubik's home, the sheriff met Mahr and Kubik's father. Mahr told the sheriff she was certain that Kubik had been kidnapped or that something had happened to him. Mahr showed the sheriff the patch of what looked like blood, along with possible drag marks, and she also showed him the video footage. Additional law enforcement officers were brought in. Kubik's property was searched, and law enforcement attempted unsuccessfully to "ping" Kubik's cell phone.

Officers then met in Wakefield, Nebraska, to continue the investigation. The investigation was proceeding along at multiple locations — some officers were at the Kubik residence and others were at the school speaking with Kubik's son. By this time, law enforcement was focused on Surber and Galvan, since they had been seen on the video footage. Relevant to this appeal are the events that were taking place at the Galvan residence and at the Surber family farm.

Officers had learned that Surber was dating Galvan's sister and that the Galvan family residence was in Wakefield. As a result, at approximately 11 a.m., an officer conducted a driveby of the Galvan residence and saw a black GMC Yukon Denali with in-transit stickers, identified as belonging to Surber, parked outside.

The officers meeting in Wakefield went to the Galvan residence. Galvan was outside and ran when he saw the officers. Galvan was told to stop, and he did so. He was handcuffed and responded affirmatively when asked if Surber was in the house. Galvan then gave officers permission to enter the house to find Surber, which they did. While conducting a protective sweep of the property, one officer found bloodied boots and pants.

Meanwhile, the officers in the house were questioning Surber about Kubik's whereabouts. Surber had apparently just showered and was wearing only a towel. When the decision to remove Surber from the house was made, one deputy allowed Surber to lead him to his clothing. The deputy had apparently been informed that bloodied clothes had been found in the garage. The deputy testified that Surber walked up to the pile of clothes that the first officer had noticed during the protective sweep. The deputy with Surber observed what appeared to be fresh blood and flies on the clothes. Surber then walked to a different part of the garage, found different clothes (which the deputy described as "dirty"), and put those clothes on.

While officers were in the Galvan residence, Deputy Roger Peterson received a phone call from Surber's mother, who was Peterson's neighbor. Peterson had actually seen Surber at approximately 8 a.m. that day, driving away from Wakefield and within 5 or 6 miles of the Surber family farm. Peterson had driven by that farm to check for Surber's vehicle before it was spotted at the Galvan residence.

Upon reaching Peterson, Surber's mother told Peterson that if something was going on with Surber, Peterson should know that Surber had been at the Surber family farm that morning. While the farm included a house, no one resided on the property, and the property was owned by the brother of Surber's mother, who lived in New York. When he was contacted, he gave Peterson permission to search the property, stating that law enforcement should "go ahead and do what you need to do."

Law enforcement then searched the property located near Dixon, Nebraska. They found a silver Chevy Impala that had a window broken out and what appeared to be blood on the rear bumper and lid of the trunk. Peterson testified that he had responded to a recent accident that Surber had been involved in and that Surber had been driving a silver Chevy Impala. The Impala's vehicle identification number came back as

Surber's; the plates on the Impala were registered to a red Dodge Charger owned by Surber.

Near the Impala, officers also discovered blood droplets, what appeared to be human flesh, a burn barrel that contained ash and what appeared to be human flesh, a red gas can, a spray bottle with what appeared to be blood on it, and a bloody knife. A telephonic warrant was submitted for the trunk of the Impala. After the warrant was obtained, the trunk was opened to reveal a severed human arm and leg.

On November 5, 2016, Kubik's head and torso, along with several organs and a severed arm and leg, were found in an area culvert. The cause of death was determined to be a gunshot wound to the head, with dismemberment after death.

Further searches of the Impala were completed after the vehicle was impounded. More blood was found, along with two cell phones, at least one of which appeared to belong to Kubik. Paperwork in the glovebox indicated the Impala belonged to Surber. DNA testing on the blood from the Impala, the Kubik residence, the Surber family farm, the boots and clothing found at the Galvan residence, and other evidence was shown to be consistent with Kubik. A knife found near the Impala had Surber's fingerprints on it, but not Galvan's or Kubik's.

Surber was arrested and charged with Kubik's murder. At trial, Surber testified in his own defense. He contended that he shot Kubik in self-defense during a dispute over ownership of the red Dodge Charger found at the Kubik residence. In his testimony, Surber also admitted to dismembering and disposing of Kubik's body, with Galvan's help.

## MOTION TO SUPPRESS

Surber filed several motions to suppress relating to the searches conducted at the Galvan residence and at the Surber family farm. As relevant to this appeal, Surber argued that the telephonic warrant obtained for the trunk of the Impala was invalid and that the severed arm and leg found in the Impala's trunk should be suppressed. Surber also argued that the

search of the Galvan residence was not supported by probable cause. As to the Impala, the district court ultimately concluded that the search was invalid due to violations of statutory law (though not a constitutional violation), but that the brother of Surber's mother had given consent to the search, and the court further concluded that the automobile and emergency exceptions applied. As to the Galvan residence, the court agreed that the search was not supported by probable cause, but that the boots and clothes were in plain view and admissible.

## COMPETENCY

Surber's competency to stand trial has been a significant issue throughout these proceedings. In late March 2017, shortly after Surber was arrested, his counsel sought a competency evaluation, which was granted. Following that evaluation by Dr. Klaus Hartmann at the Lincoln Regional Center (LRC), Surber was found not competent to stand trial, but Hartmann opined that there was a reasonable likelihood that competency could be restored. As such, Surber was placed at LRC.

Surber was not cooperative with LRC's treatment efforts, and in August 2017, the State sought court approval to administer involuntary treatment. As part of the process to seek this approval, LRC was able to administer medications involuntarily on an emergency basis for 14 days. By the time of the hearing on the State's motion, the evidence showed that Surber had voluntarily continued to take his medication after the 14-day time period expired. As such, the court declined to order involuntary treatment.

But in January 2018, the State again sought involuntary treatment for Surber. Testimony from Dr. Farid Karimi was adduced. Karimi testified that Surber had taken his medications voluntarily for a time, then refused because he claimed he was experiencing side effects. Karimi indicated that Surber's claimed side effects were not commonly reported and that, in any case, Surber's presentation of psychosis was "very unconventional" in that he displayed "selective" symptoms that

mimicked the symptoms of others at LRC. For example, one patient barked like a dog, so Surber began barking. Another patient drooled, so Surber stopped barking and began drooling. Later, Surber stopped drooling and started talking to himself, claiming he had many children who were angels.

According to Karimi, symptoms of a legitimate psychosis should remain the same, and he, Karimi, believed that Surber was malingering. Karimi also noted that it was not clear if Surber was also suffering from an actual mental defect because he would not take his medications or comply with treatment efforts. Karimi indicated that although he thought Surber understood the proceedings, he also thought Surber would be likely to interfere with court proceedings. Ultimately, Karimi thought treatment should be continued to ensure the restoration of Surber's competency.

Although Karimi thought treatment should continue, counsel for Surber indicated that Surber was competent and trial should proceed. The State, meanwhile, asked that Karimi's request for additional time to ensure Surber's competency be granted. The court agreed, and Surber was declared incompetent. The State's motion for involuntary treatment was granted, and Surber was sent back to LRC. Surber appealed that order, but ultimately dismissed it before it could be disposed of by an appellate court.

In October 2018, the district court held a status hearing regarding Surber's competency. Surber had again been evaluated by Karimi in August 2018, at which point, Karimi agreed that Surber was malingering and was competent to stand trial. The court agreed and found Surber competent.

In April 2019, the defense again asked for a competency evaluation by the staff psychiatrist and staff psychologist at the Department of Correctional Services. The psychiatrist testified that it was his belief that Surber was not oriented to time and place, but the psychiatrist had no opinion as to Surber's competence. The psychologist testified that Surber was clear and oriented when they spoke, but Surber's judgment did

appear to be impaired, and that the psychologist could not tell whether that was due to mental illness or a behavioral disorder that Surber could control.

In light of this testimony, the court again ordered a competency evaluation to be conducted by Hartmann at LRC. In May 2019, Hartmann found Surber incompetent to stand trial and treatment at LRC was ordered to be resumed.

In July 2019, while Surber was apparently still waiting for a bed to become available at LRC, the State again sought involuntary medical treatment. Surber was refusing to take his prescribed medications and was instead requesting narcotics. In addition, Surber was having continuing behavioral swings. Medical staff sought to medicate Surber with antipsychotics and mood stabilizers. That request was granted.

In January 2020, yet another doctor from LRC performed a competency evaluation. That doctor opined that Surber's sanity had been restored. Surber was found competent to stand trial, which was eventually set for August 2020.

On August 13, 2020, defense counsel filed a motion to withdraw, noting that Surber had "expressed his desire to no longer be represented by counsel." Following a hearing on August 17, the court found that Surber could represent himself, but upon request by defense counsel, the court reconsidered that ruling and reversed it on August 18. The next day, August 19, just 5 days before trial was set to begin, Surber's counsel filed a motion to determine Surber's competency. The court ordered yet another competency evaluation by Hartmann.

As with most of the prior evaluations performed on Surber, Hartmann opined that Surber understood the nature of the proceedings against him, but that Hartmann believed Surber was not competent because Surber would not be able to adequately communicate with counsel. When Hartmann testified at the hearing, he acknowledged that he had witnessed Surber's acting appropriately and communicating with his counsel, but indicated that did not change his mind regarding Surber's competency.

Hartmann also testified that there might still be issues because Surber did not trust his counsel. Hartmann's evaluation noted that on prior occasions, he and other treating professionals had suspected that Surber was malingering, but that Hartmann did not see signs of malingering during his most recent evaluation.

The defense argued that Surber was not competent based on Hartmann's report, agreeing that Surber understood the nature of the proceedings, but lacked the capacity to communicate with his counsel or assist in preparing his defense. The State responded that Surber's ability to assist his counsel was not a sufficient basis to find him incompetent.

The district court concluded that Surber was competent to stand trial, reasoning that the parties agreed Surber understood the nature of the proceedings against him. The district court further found that whether Surber was able to competently assist his counsel because he did not trust his counsel was not a matter of competency. After the court found Surber competent, the case proceeded to trial. Ultimately, Surber was convicted of first degree murder, use of a firearm to commit a felony, and possession of a firearm by a prohibited person, and he was sentenced to life imprisonment for the murder conviction. Surber appeals.

## ASSIGNMENTS OF ERROR

Surber assigns that the district court erred in finding (1) him competent to stand trial, (2) exceptions to the exclusionary rule applicable such that evidence found (a) in the Impala and (b) at a residence in Wakefield were admissible, and (3) that second searches of the Impala and the Galvan residence did not violate the Fourth Amendment.

## STANDARD OF REVIEW

[1] The question of competency to stand trial is one of fact to be determined by the court, and the means employed in

resolving the question are discretionary with the court. The trial court's determination of competency will not be disturbed unless there is insufficient evidence to support the finding.[1]

[2] To conduct harmless error review, we look to the entire record and view the erroneously admitted evidence relative to the rest of the untainted, relevant evidence of guilt.[2]

## ANALYSIS

### Competency

[3-7] We turn first to Surber's first assignment of error: The district court erred in finding him competent to stand trial. A person is competent to plead or stand trial if he or she has the capacity to understand the nature and object of the proceedings against him or her, to comprehend his or her own condition in reference to such proceedings, and to make a rational defense.[3] The competency standard includes both (1) whether the defendant has a rational as well as factual understanding of the proceedings against him or her and (2) whether the defendant has sufficient present ability to consult with his or her lawyer with a reasonable degree of rational understanding.[4] There are no fixed or immutable signs of incompetence, and a defendant can meet the modest aim of legal competency, despite paranoia, emotional disorders, unstable mental conditions, and suicidal tendencies.[5] The question of competency to stand trial is one of fact to be determined by the district court.[6] A court's decision regarding competency will not be disturbed absent insufficient evidence to support that finding.[7]

---

[1] *State v. Jenkins*, 303 Neb. 676, 931 N.W.2d 851 (2019).

[2] *State v. Said*, 306 Neb. 314, 945 N.W.2d 152 (2020).

[3] *State v. Jenkins, supra* note 1.

[4] *Id*.

[5] *State v. Lang*, 305 Neb. 726, 942 N.W.2d 388 (2020).

[6] *Id*.

[7] See *State v. Jenkins, supra* note 1.

As the record demonstrates, Surber's competency was at issue throughout these proceedings. After variously being found not competent, then competent, and being treated by both the Department of Correctional Services and LRC, Surber was ultimately found competent and a trial date was set. But just days before the trial, Surber's counsel once again sought a competency evaluation, which was granted. Hartmann conducted that evaluation. We note that Hartmann's evaluation also considered whether Surber was qualified to represent himself, as that had been at issue during proceedings occurring around the same time, although it is not at issue in this appeal.

In his evaluation, done virtually, Hartmann—who had previously indicated that Surber was malingering—opined that presently Surber was not malingering, and further concluded:

> This man has sufficient mental capacity to appreciate his presence in relation to time, place, and things and possesses the elementary mental processes such that he understands that he is in a court of law charged with criminal offenses. However, his present mental functioning appears to be at least in part at the delusional level . . . . He is not considered able to consult with and assist counsel in preparation of his defense. As such, to a reasonable degree of medical certainty, I consider this man not to have the capacity to stand trial and represent himself without competent counsel.

The court noted Hartmann's evaluation and found it helpful, but ultimately concluded Surber was competent to stand trial. We affirm this conclusion.

In this case, during Hartmann's evaluation, he found Surber to be incompetent to stand trial, not because he thought Surber did not understand the proceedings, but because he felt that Surber did not meet the second criteria: having the sufficient present ability to consult with his or her lawyer with a reasonable degree of rational understanding.

The district court, having the benefit of many competency evaluations and treatment records, disagreed with this assessment, noting that the court's own observations of Surber showed an individual "conversing with both of his appointed attorneys during Dr. Hartmann's testimony." The court further noted that the three "were able to have exchanges without it disrupting the proceedings" and that Surber was "quite active in following the exchanges . . . and the notes that they were taking." The court continued:

> Surber may not completely trust his counsel, and the basis of his feelings may not be based in fact (i.e. his belief that counsel destroyed evidence), and his feelings may even be delusional, as Dr. Hartmann alleges in his report. But what the Court observed during the competency hearing was an accused who seemed to be following the proceedings and communicating with counsel.

[8,9] Surber's conduct during this hearing is relevant to the question of whether he was competent, particularly given the nature of his identified incompetency. Surber's behavior suggests that he had control over his actions. Several courts have found that a defendant with voluntary control to cooperate is not incompetent simply because he or she refused to cooperate,[8] refused to communicate with defense counsel,[9] or could not get along with or disapproved of defense counsel.[10] Even identifying with bizarre legal theories, whether or not sincerely held, does not automatically suggest incompetence.[11]

The ultimate fact finder in this case was the district court. We have been directed to no authority, nor has our own research revealed authority, requiring a district court to adopt

---

[8] *U.S. v. Simpson*, 645 F.3d 300 (5th Cir. 2011).

[9] *U.S. v. Kiderlen*, 569 F.3d 358 (8th Cir. 2009).

[10] *U.S. v. Miller*, 531 F.3d 340 (6th Cir. 2008).

[11] *U.S. v. Jonassen*, 759 F.3d 653 (7th Cir. 2014).

the opinion of an expert in such matters.[12] The observations of the district court, along with the prior evidence of malingering by Surber, provide sufficient evidence to support the district court's conclusion that Surber was competent to stand trial, regardless of the conclusions on competency reached by Hartmann. There is no merit to Surber's first assignment of error.

## Motion to Suppress

At issue on appeal is (1) whether the district court erred when it found that the consent, automobile, and emergency exceptions to the warrant requirement were met such as to allow the admittance of the severed leg and arm found in the trunk of the Impala and (2) whether the plain view doctrine allowed the admission of the bloodied clothes found in the Galvan garage and the bloodied boots found in the Galvan residence. In addition, Surber challenges a second warrant authorizing searches of the Impala and the Yukon because those warrants were authorized with reference to the prior claimed unlawful searches of the Impala and the Galvan residence.

[10] Surber testified to the fact that he dismembered Kubik's body and disposed of an arm and a leg in the trunk of the Impala. He further testified that the brown boots found in the Galvan residence were his boots and were likely to have blood on them as he was wearing them when he dismembered Kubik. As such, we conclude that Surber has waived any argument he has with respect to this evidence on appeal. The introduction of evidence by the defense waives any objection to the earlier introduction of evidence on the same subject by the State.[13]

---

[12] Cf. 31A Am. Jur. 2d *Expert and Opinion Evidence* § 135 (2012); 21 Am. Jur. 2d *Criminal Law* § 100 (2016); 22A C.J.S. *Criminal Procedure and Rights of Accused* § 518 (2016); and 32 C.J.S. *Evidence* §§ 871, 937, 946, and 970 (2020) (all collecting cases).

[13] *State v. Andersen*, 232 Neb. 187, 440 N.W.2d 203 (1989).

[11-13] Surber did not testify regarding the bloodied clothes found in the garage. But to the extent that those clothes ought to have been suppressed, we find that any error in failing to do so is harmless. To conduct harmless error review, we look to the entire record and view the erroneously admitted evidence relative to the rest of the untainted, relevant evidence of guilt.[14] Harmless error review looks to the basis on which the trier of fact actually rested its verdict; the inquiry is not whether in a trial that occurred without the error a guilty verdict would surely have been rendered, but, rather, whether the actual guilty verdict rendered in the questioned trial was surely unattributable to the error.[15] Erroneous admission of evidence is harmless error and does not require reversal if the evidence is cumulative and other relevant evidence, properly admitted, supports the finding by the trier of fact.[16] Overwhelming evidence of guilt can be considered in determining whether the verdict rendered was surely unattributable to the error, but overwhelming evidence of guilt is not alone sufficient to find the erroneous admission of evidence harmless.[17]

Significantly, Surber testified in some detail to the events surrounding Kubik's death. While Surber argues that he acted in self-defense, the bloodied clothes he seeks to suppress were not probative of his defense of self-defense, but instead were probative as to who caused Kubik's death. Between Surber's testimony that he was responsible for Kubik's death and the myriad other evidence suggesting that Surber was responsible, we hold that the guilty verdicts in this case were unattributable to any erroneous admission of the bloodied clothes found in Galvan's garage.

---

[14] *State v. Said, supra* note 2.

[15] *State v. Figures*, 308 Neb. 801, 957 N.W.2d 161 (2021).

[16] *Id.*

[17] See, e.g., *State v. Jennings*, 305 Neb. 809, 942 N.W.2d 753 (2020).

Finally, we briefly note that with respect to the Yukon, the State did not offer at trial any of the evidence found in the search of the Yukon. As such, we do not need to address those arguments on appeal.

There is no merit to Surber's second and third assignments of error.

## CONCLUSION

The judgment of the district court is affirmed.

Affirmed.