In the

# United States Court of Appeals
## For the Seventh Circuit

No. 13-1410

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

MARTIN J. JONASSEN,

*Defendant-Appellant*.

Appeal from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 2:11cr163-001 — **James T. Moody**, *Judge*.

ARGUED FEBRUARY 20, 2014 — DECIDED JULY 16, 2014

Before EASTERBROOK, MANION, and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*. Martin Jonassen kidnapped his 21-year-old daughter E.J.[1] from her home in Missouri and took her to a motel in Indiana, where he held her against her will

---

[1] A pseudonym.

and sexually assaulted her. On the third day of her captivity, E.J. managed to escape and was seen fleeing naked from the motel, rope still tied around her leg, desperately screaming for help. Jonassen chased her through the street and into a nearby liquor store, and after a violent struggle, recaptured her. Police responding to the scene arrested him in the liquor store parking lot. E.J. described the ordeal to police, and Jonassen faced serious federal felony charges.

Almost immediately after he was arrested, Jonassen began a concerted effort to get E.J. to recant. She did not do so, but the intimidation was successful in the sense that it made her unavailable as a witness. Although she had cooperated with the government when Jonassen was indicted and throughout the pretrial period, she suddenly clammed up when called to testify at trial, saying "I don't remember" (or something equivalent) in response to all of the prosecutor's questions. The government moved to admit her statements to police under Rule 804(b)(6) of the Federal Rules of Evidence, which allows admission of hearsay against a party who wrongfully procures a witness's unavailability. The district court granted the motion. The jury convicted Jonassen of kidnapping, *see* 18 U.S.C. § 1201(a)(1), and obstruction of justice, *see id.* § 1512(b)(1), and the court imposed a lengthy prison sentence.

Jonassen raises three issues on appeal. First, he argues that the district court should have conducted a competency hearing under 18 U.S.C. § 4241. Second, he challenges the court's decision to admit E.J.'s prior statements under Rule 804(b)(6). Finally, he argues that the court erred in denying his posttrial motion regarding Jencks Act material. *See* 18 U.S.C. § 3500.

We reject these arguments and affirm. The district court
properly declined to conduct a competency hearing. Although
Jonassen asserted bizarre legal theories based on his claim of
"sovereign citizenship," that alone does not provide a reason
to doubt his competence to stand trial, and the record does not
otherwise suggest that he lacked the ability to understand the
proceedings. The court's evidentiary ruling also was sound.
The government laid an ample foundation for admission of the
hearsay statements under Rule 804(b)(6); the evidence estab-
lished that Jonassen used bribery, guilt, and various forms of
psychological intimidation to procure E.J.'s unavailability.
Finally, because Jonassen did not request Jencks Act material
before the close of trial, his claim for relief under the Act
necessarily fails.

## I. Background

E.J. was born in November 1989 to Martin and Alice
Jonassen in the back of their family van. She led what appears
to have been an isolated life; she was homeschooled and had
only once seen a doctor before her kidnapping. The record
suggests that Martin subjected the family to harsh discipline
and physical, emotional, and sexual abuse. Her parents
separated when E.J. was young, and she thereafter lived with
her mother and three of her brothers on a farm near Jameson,
Missouri. Martin Jonassen also lived in the area.

On Saturday, September 10, 2011, Jonassen picked up E.J.
from the farm ostensibly to take her shopping. When E.J. did
not return as planned for her brother's birthday celebration,
her mother began to worry and tried unsuccessfully to contact

her. Jonassen had driven her to Portage, Indiana, where he checked into a motel on Sunday evening. At around ten-thirty on Monday morning, two motel employees saw E.J. running naked down the motel service road with a rope tied to her leg. Jonassen emerged from the motel room and chased her on foot, pulling up his pants as he ran (he was wearing nothing else) before getting into his car to follow her. A witness would later testify that E.J. looked like she was "running for her life," frantically darting through traffic on a very busy road.

E.J. ran into a nearby liquor store screaming "help me, help me, please help me" to the store clerk. Jonassen followed her into the store and told the clerk that his daughter was on drugs. He struggled violently to recapture her, and they fell to the ground, knocking over merchandise in the process. Jonassen succeeded in overpowering his daughter, and he dragged her back to his car.

Portage police officers responding to a 911 call about the incident arrived at the scene and arrested Jonassen in the liquor store parking lot before he was able to leave with E.J. He told police that he was taking his daughter to Michigan to prevent her from dating a 60-year-old man, whom he later referred to as "some Hugh Hefner." After securing Jonassen, officers then sought to assist E.J., who was huddled in the back of the car crying. E.J. told Officer Flora Ryan that Jonassen had taken her to Indiana against her will because he thought she was going to have sex with an older man. When asked if she was raped, she first shook her head no. But she told the officer that she had been tied up in the motel room and nodded when asked if her father had sex with her, and the officer observed the rope

still around her ankle. After the on-scene interview with the police, E.J. was taken to the hospital where she was examined by nurse Janice Ault, who observed abrasions, cuts, a rash, and bruises all over her body. E.J. also told Ault that Jonassen had taken her from her home in Missouri against her will.

The police searched the motel room, which was in total disarray. There was rope around a chair, and more rope was found in Jonassen's car. A table had been moved to a location consistent with it being used to block the door. Near the table was a toilet-tank cover, also apparently used as a door block. The bedding was submitted to the Indiana State Crime Lab for testing. Jonassen's semen was found on the sheets, and one stain contained both Jonassen's and E.J.'s DNA.

The day after his arrest, Jonassen began what would be an extended campaign to get E.J. to retract her statements to the police. Ignoring a no-contact order prohibiting any communication with E.J.—including by letter, phone, or intermediary— Jonassen contacted her both directly and through several family members. Over a seven-month period, Jonassen made more than 75 calls and sent 20 letters attempting to dissuade E.J. from testifying. As the district judge characterized the calls and letters, Jonassen variously used guilt, bribery, veiled threats, and other forms of psychological intimidation in a persistent effort to get E.J. to recant. For example, when speaking directly with E.J. on the phone, Jonassen told her that he loved her and did not want to spend years in prison. Through multiple channels he offered her money (up to $14,000), a moped, and part of his property in Michigan. His letters reiterated these offers, promised to stay out of her life,

and claimed he was being mistreated in jail. He characterized the whole episode as nothing more than a family spat and suggested that she would be blessed for lying to the police like the Jewish midwives who lied to Pharaoh to save newborn children and Rahab who lied to soldiers in Jericho to protect Jewish spies. He also offered to pay his sons Michael and Elijah if they could persuade E.J. to sign a statement—dictated word for word by Jonassen—indicating that she freely accompanied him to Indiana.

The United States Attorney in Northern Indiana indicted Jonassen on one count of kidnapping, *see* 18 U.S.C. § 1201(a)(1), and one count of obstruction of justice, *see id.* § 1512(b)(1). Jonassen waived his right to counsel and represented himself, although the court appointed attorney John Martin to serve as standby counsel. Jonassen attempted to mount a "sovereign citizen" defense, filing many motions asserting variations on this frivolous legal theory.[2] Attorney Martin moved for a competency hearing, advising the court that "[a]lthough [Jonassen] at times appears to have rational thoughts concerning this matter, more often than not his thoughts are irrational and his thought process appears to be scrambled." Martin also stated that Jonassen "continues to advance irrelevant and inconsequential theories of defense instead of understanding

---

[2] Defendants claiming to be "sovereign citizens" assert that the federal government is illegitimate and insist that they are not subject to its jurisdiction. The defense has "no conceivable validity in American law." *United States v. Schneider*, 910 F.2d 1569, 1570 (7th Cir. 1990).

and comprehending the true nature of the allegations and appears to lack interest in rational defenses."

A magistrate judge held a hearing on the motion and questioned Jonassen about his understanding of the proceedings. Jonassen indicated that he understood the charges against him and acknowledged that he was facing "quite a number of years" in prison. He explained that he was refusing the assistance of counsel to avoid losing the ability to assert that he was "a natural person, common law citizen" over whom the court lacked jurisdiction. He also told the judge that he had never been treated for any mental-health issues. The magistrate judge found no basis for a competency hearing and denied the motion. Martin filed an objection with the district court.

The district court addressed the attorney's concerns about Jonassen's competence during a pretrial conference. After conducting an extended colloquy with Jonassen and questioning Martin about his concerns, the court concluded that there was no reasonable cause to believe that Jonassen was suffering from a mental illness that would prevent him from understanding the proceedings. The court rejected the request for a competency hearing, and the case moved forward to trial.

Up to this point in the proceedings, E.J. had been cooperating with the government and had talked to investigators and prosecutors on several occasions. On the evening before trial, E.J. met with Portage Police Detective Janis Regnier, FBI Agent Matthew Chicantek, and two Assistant United States Attorneys. They went over her story in detail in preparation for her testimony. E.J. confirmed that Jonassen had tied her up and taken her from Missouri against her will. She also described for

the first time the events of a multiweek trip she had taken with Jonassen to Michigan the summer before the kidnapping. During that trip, Jonassen made sexual advances toward her that included lying on top of her and masturbating in front of her.

When trial began the next day, however, E.J. refused to answer any questions put to her by the prosecutor. Instead, she answered every question with "I don't remember" or "not that I know of" or "I don't know what you are talking about" or a similar phrase. She responded in this way even when asked simple questions about her age, her date of birth, her nickname, and her parents' names. When the prosecutor asked if she was refusing to answer because she feared her father, she answered, "I'm not afraid of anything or anybody."

In light of this unusual development, at the end of the first day of trial the judge excused the jury and heard the government's motion to admit E.J.'s statements to police under Rule 804(b)(6) of the Federal Rules of Evidence, which permits the admission of hearsay against a party who wrongfully procures the unavailability of the declarant as a witness. The hearing extended into the evening and continued the next morning. The government presented evidence of Jonassen's elaborate effort to get E.J. to recant, including the phone calls and letters playing on her emotions with guilt, bribery, and various forms of intimidation. Alice Jonassen testified about why E.J. would have reason to fear her father. Special Agent Eric Field testified that E.J. told him that she thought her father was facing too much time in prison and that his time served in

pretrial detention plus a term of probation should be sufficient punishment.

Ruling on the government's motion, the judge noted that E.J.'s testimony was unlike anything he had seen in over 40 years on the bench. He concluded that E.J.'s performance on the witness stand—professing a "total lack of recall of anything"—made her unavailable as a witness within the meaning of Rule 804(a). *See* FED. R. EVID. 804(a)(3) (stating that a declarant is considered unavailable if she "testifies to not remembering the subject matter"). He further concluded that Jonassen had procured E.J.'s unavailability through wrongful acts and with specific intent to achieve that result, satisfying the criteria for admission of her hearsay statements under Rule 804(b)(6).

When the jury returned to the courtroom, the government introduced E.J.'s prior statements through Agent Chicantek and Detective Regnier, and also introduced a signed, handwritten statement from E.J. describing her abduction. The rest of the government's case consisted of testimony from eyewitnesses, investigators, Alice Jonassen, and Janice Ault, along with recordings of Jonassen's phone calls from jail, surveillance video from the liquor store, and physical evidence from the motel.

The jury convicted Jonassen on both counts and also found by special verdict that Jonassen's obstructive conduct was "intended to influence, delay, or prevent" E.J.'s testimony.

Following trial, the probation office submitted a presentence report to the court. The report referred to E.J.'s meeting with prosecutors on the night before trial. More specifically,

the probation office reported that E.J. "met with law enforce-
ment and government counsel the night before she was
scheduled to testify" and "gave her most detailed summary to
date" of the kidnapping. The report went on to summarize the
information she provided during that interview.

After reviewing the presentence report, Jonassen filed a
"motion" objecting that he had not received any report or
notes about this meeting. The motion is captioned "Gov.
Admits To Withholding Evidence" and is vague about the
grounds for relief, but it does clearly request a new trial or
judgment of acquittal. The court ordered a response from the
government.

The government interpreted the "motion" as a Jencks Act
request for a copy of any written statement provided or
adopted by E.J. during the meeting. *See* 18 U.S.C. § 3500. The
government advised the court that E.J. "did not provide, and
no one else created, a written document constituting a state-
ment by her." The government also noted that the Assistant
United States Attorney in charge of the case was "the only
person present who took notes during the meeting," and her
notes were recorded on a "draft direct examination outline"
prepared for use at trial. These notes, the government ex-
plained, were "privileged attorney work product rather than
a discoverable witness statement." Finally, the government
explained that the information E.J. provided during the
meeting was neither exculpatory nor inconsistent with her
prior statements and thus was not subject to disclosure under
*Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*,
405 U.S. 150 (1972).

After receiving the government's response, the judge concluded that the notes were not subject to disclosure and denied Jonassen's motion for a new trial or judgment of acquittal. Sentencing proceeded, and the judge imposed a sentence of 480 months on the kidnapping conviction and a concurrent term of 240 months on the conviction for obstruction of justice. This appeal followed.[3]

## II. Discussion

### A. Competency Hearing

When presented with a motion requesting a competency hearing, a district court

> shall grant the motion … if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.

18 U.S.C. § 4241(a); *see also United States v. Woodard*, 744 F.3d 488, 493 (7th Cir. 2014) ("A district court is not required to order an examination or a competency hearing unless there is a bona fide doubt that arises as to a defendant's competency before trial.").

---

[3] Jonassen accepted the assistance of counsel on appeal. Thomas L. Shriner, Michael A. Bowen, and Kate E. Gehl, of Foley & Lardner LLP, accepted the appointment. They have ably discharged their duties.

The district judge denied Attorney Martin's motion for a competency hearing and did not order one sua sponte at any point in the proceedings. Jonassen argues that the district court's treatment of Jonassen's competency was both procedurally and substantively flawed. Because the district court is in the best position to assess the mental status of a defendant, we review for abuse of discretion. *United States v. Alden*, 527 F.3d 653, 659 (7th Cir. 2008).

Jonassen's procedural argument is that Martin's motion for a competency hearing was denied without sufficient findings stated on the record. We disagree. Although the magistrate judge's ruling was cursory, the district judge adequately explained his conclusion that a competency hearing was not necessary. After a colloquy with Jonassen, the judge turned to Martin, Jonassen's standby counsel, and questioned him about the basis for the motion and Jonassen's relevant personal history. During this discussion, it became clear that Jonassen had no known history of mental illness, and Martin was primarily concerned about Jonassen's insistence on pursuing idiosyncratic and frivolous legal theories. The judge remarked that Jonassen's behavior did not suggest that he was suffering from a mental-health problem that would require a full competency evaluation; instead, his conduct was more likely rooted in obstructionism. Although the judge did not make formal "findings" as such, he referred back to the colloquy with Jonassen and the exploration of standby counsel's concerns, and stated that the facts did not show that Jonassen was incapable of understanding the proceedings against him. A more formal ruling may have been preferable, but the judge's ruling is not procedurally insufficient.

On the merits the district court did not abuse its discretion in declining to order a competency hearing. Appellate counsel argues that Martin's observations, Jonassen's actions at trial, and the district judge's own statements during trial created reasonable cause to believe Jonassen was incompetent to stand trial, necessitating a hearing. This argument, like Martin's argument below, relies heavily on Jonassen's persistent assertion of a sovereign-citizen defense. But we have held that adherence to bizarre legal theories, whether they are "sincerely held" or "advanced only to annoy the other side," does not "imply mental instability or concrete intellect … so deficient that trial is impossible." *United States v. James*, 328 F.3d 953, 955 (7th Cir. 2003); *see also Alden*, 527 F.3d at 659–60 (holding that the defendant's "obsession with irrelevant issues and his paranoia and distrust of the criminal justice system" did not require a district court to sua sponte order a competency hearing). Criminal defendants often insist on asserting defenses with little basis in the law, particularly where, as here, there is substantial evidence of their guilt.

And standby counsel's assertions turned out to be much more equivocal than they originally seemed. For example, Martin acknowledged when questioned by the judge that Jonassen's behavior could show "that he is just being obstructionist to some degree and that he is just intentionally not directly answering questions and refusing to cooperate … . I think it's … possible that he completely understands everything and his actions are simply to be obstructionist and therefore he does understand."

As for Jonassen's performance at trial, it's true that he often struggled to effectively question witnesses and parts of his closing argument were stricken. But these problems often arise when someone without legal training represents himself; the rules of evidence and criminal procedure are not always straightforward. *See Gideon v. Wainwright*, 372 U.S. 335, 344–45 (1963). Considered as a whole, and in light of his pro se status, Jonassen's conduct at trial demonstrates that he grasped the key elements of the charges against him. For example, he frequently asked witnesses whether they had seen his daughter cross state lines, a necessary element of the kidnapping charge. *See* 18 U.S.C. § 1201(a)(1). He also lodged relevant objections to hearsay and testimony implicating marital privilege. Moreover, his intense effort before trial to get E.J. to sign a statement saying that she had willingly accompanied him to Indiana demonstrates that he understood the central elements of the kidnapping charge.

Finally, appellate counsel points to two statements by the trial judge as evidence suggesting the need for a competency hearing. First, after Jonassen made a flippant remark, the judge chastised him by saying, "I still don't know that you know how serious this case is." Considered against the backdrop of Jonassen's other obstructionist behavior, this statement is more likely the product of the judge's frustration that Jonassen was *choosing* not to take the proceedings seriously, and not evidence that Jonassen lacked the mental capacity to understand them. Second, the judge suggested mid-trial that Jonassen could benefit from letting Martin step in to conduct the defense: "You sure you don't want [standby counsel] to take over for you? He's competent. He's skilled. He knows what

he's doing. You have none of those attributes." This statement shows only that the judge thought Jonassen would benefit from the help of trained counsel—an unremarkable proposition—and not that he thought Jonassen was incapable of understanding the proceedings.

These snippets from the record do not establish that the judge abused his discretion in declining to conduct a competency hearing. Jonassen had no history of mental illness, and substantial evidence supports the judge's conclusion that he was competent to stand trial. As Jonassen explicitly told the court: "I'm well aware of the charges and the nature of the charges and the consequences." The record does not establish reasonable cause to believe that Jonassen was suffering from a mental disease or defect that rendered him incompetent to stand trial.[4]

---

[4] Jonassen's opening brief obliquely suggests that even if Jonassen was competent to stand trial, he was not competent to represent himself at trial according to *Indiana v. Edwards*, 554 U.S. 164 (2008). Jonassen's reply brief does not return to this subject, and Jonassen's counsel retreated from the point at oral argument, acknowledging that *Edwards* does not *require* a judge to override a defendant's decision to represent himself once the defendant is found competent to stand trial under the *Dusky* standard. *See Dusky v. United States*, 362 U.S. 402 (1960). Rather, the case *allows* the judge "to insist upon representation by counsel for those competent enough to stand trial under *Dusky* but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." *Edwards*, 554 U.S. at 178; *see United States v. Berry*, 565 F.3d 385, 391 (7th Cir. 2009) ("The Constitution *may* have allowed the trial judge to block [the defendant's] request to go it alone, but it certainly didn't require it."); *United States v. Bernard*, 708 F.3d 583, 590 (4th Cir. 2013), *cert. denied*,

(continued...)

## B. Admission of Hearsay Under Rule 804(b)(6)

Rule 804(b)(6) permits the admission of a hearsay statement when it is "offered against a party that wrongfully caused … the declarant's unavailability as a witness, and did so intending that result." FED. R. EVID. 804(b)(6). E.J. was unavailable within the meaning of the rule because she "testifie[d] to not remembering the subject matter." FED. R. EVID. 804(a)(3). To admit a hearsay statement under Rule 804(b)(6), the government must demonstrate: "(1) that the defendant engaged or acquiesced in wrongdoing, (2) that the wrongdoing was intended to procure the declarant's unavailability, and (3) that the wrongdoing did procure the unavailability." *United States v. Scott*, 284 F.3d 758, 762 (7th Cir. 2002). Jonassen challenges the district court's conclusion that his wrongdoing procured E.J.'s unavailability. We review for clear error. *Id.*

And we find no error. The record easily supports the court's conclusion that Jonassen successfully procured E.J.'s unavailability by incessant pretrial manipulation. As we have recounted, Jonassen worked tirelessly for seven months to persuade E.J. to recant. His tactics ranged from pleas for sympathy to bribes. He bombarded E.J. with phone calls,

---

[4] (…continued)

134 S. Ct. 617 (2013) ("*Edwards* itself reaffirmed that a court may constitutionally permit a defendant to represent himself so long as he is competent to stand trial. … At bottom, *Edwards* does not stand for the proposition that a state *must* deny the right of self-representation to a defendant of questionable mental competence or that district courts must conduct an additional '*Edwards*' inquiry into the competency of every defendant who requests to proceed pro se.").

letters, and messages delivered through several family members. All this effort was in clear violation of a court order and directed at a young woman who was susceptible to his manipulation: According to Alice Jonassen's testimony at the hearing, E.J. had long been subjected to abuse by her father. The evidence overwhelmingly supports the judge's conclusion.

Jonassen argues that the evidence is circumstantial and thus inadequate to support the district court's conclusion. True, E.J. did not testify that her father's actions led to her feigned memory loss, and when asked whether she feared her father, she responded that she did not fear anyone or anything. This response does not undermine the judge's ruling. The evidentiary foundation for admitting hearsay under Rule 804(b)(6) will almost always be circumstantial, and it would be odd to expect the witness herself to corroborate it:

> It seems almost certain that, in a case involving coercion or threats, a witness who refuses to testify at trial will not testify to the actions procuring his or her unavailability. It would not serve the goal of Rule 804(b)(6) to hold that circumstantial evidence cannot support a finding of coercion.

*Scott*, 284 F.3d at 764.

Moreover, fear was not the only tactic Jonassen used—he also played on E.J.'s sense of guilt. He complained in graphic detail about being sexually assaulted and malnourished in jail. And E.J.'s statement to Agent Field that she thought her father had spent enough time behind bars suggests that tactic was successful. There was more than enough evidence to support

the judge's conclusion that Jonassen wrongfully procured E.J.'s unavailability.

## C. Jencks Material

The Jencks Act requires, on the defendant's motion, that any statements of a government witness be produced after that witness testifies on direct examination. 18 U.S.C. § 3500(b). Jonassen asserts that he may have been denied access to materials he was entitled to under the Act.

Before sentencing, Jonassen received a draft copy of his presentence report, which referred to notes taken by one of the prosecutors during the interview with E.J. the night before trial. Jonassen filed a cryptic motion claiming that he was denied access to the notes and should be granted a new trial, mistrial, acquittal, dismissal, or "dissolution of this matter." The government responded that the notes were attorney work product and did not constitute a statement of any witness as defined by the Jencks Act, and were in no way exculpatory within the meaning of *Brady* and *Giglio*. The government offered to produce the notes for in camera inspection. The district court declined the offer and denied Jonassen's motion.

Jonassen's argument on appeal doesn't get out of the gate. It's true that a presumption arises in favor of an in camera inspection if the defendant makes "a reasonable argument that if the document says what he believes it says, based on the testimony of the witness on direct examination, then it can possibly be used to impeach that witness." *United States v. Allen*, 798 F.2d 985, 994–95 (7th Cir. 1986). But a request for

Jencks Act material must be made before or during trial; the Act provides no posttrial procedure or remedy.[5] In other words, the Jencks Act does not place an independent obligation on the government to disclose witness statements. *See* 18 U.S.C. § 3500(b) (The court shall produce witness statements "on motion of the defendant."). A defendant must make a timely request to trigger an in camera inspection and, if warranted, production of the documents. *See United States v. Fragoso*, 978 F.2d 896, 899 (5th Cir. 1992) ("If the defense makes a timely request and there is some indication in the record that the materials meet the Jencks Act's definition of a statement, the district court has a duty to inspect the documents in camera."). A request made after the jury has rendered its verdict is not timely. *See United States v. Clay*, 495 F.2d 700, 709–10 (7th Cir. 1974); *United States v. Petito*, 671 F.2d 68, 73–74 (2d Cir. 1982). Absent a preexisting agreement with the government concerning disclosure of witness statements, *see*, *e.g.*, *United States v.*

---

[5] Jonassen's appellate counsel stated at oral argument that it is "possible" Jonassen made a broad request for Jencks material during trial. Counsel was referring to one of 40 arguments lodged by Jonassen in an oral motion for judgment of acquittal made at the close of the government's case:

> Per … Federal Rule of Criminal Procedure 3500(a)[,] no statement or report made by prospective witnesses shall be the subject of subpoena or discovery or inspection until said witness has testified on direct examinations[] — that's a direct quote to all my stolen papers yesterday that we played with for three hours.

Jonassen does (inaccurately) cite to the Jencks Act and recite some of its text. However, he is clearly referring to papers of his own that he wanted back, not to statements by any particular government witness.

*McKenzie*, 768 F.2d 602, 609 (5th Cir. 1985), a Jencks motion must be made after the relevant witness testifies on direct examination and at a minimum before the close of evidence, *see United States v. Knapp*, 25 F.3d 451, 461 (7th Cir. 1994); *United States v. Carter*, 613 F.2d 256, 261 (10th Cir. 1979) (holding that defendant failed to make a timely assertion of his rights under the Jencks Act when he requested the materials before trial, which was too early, and again after trial, which was too late, but not during trial after the relevant witness testified).

The Jencks Act provides for disclosure of witness statements that can be used to cross-examine government witnesses *at trial*. There can be no error in refusing to order their production, much less refusing to inspect them in camera, when the initial request is made after trial has concluded. *See Clay*, 495 F.2d at 709–10 ("Because the defendants could only properly use [an alleged Jencks] statement to impeach the testimony of [the witness] during cross-examination, the motion for production made at the conclusion of the trial was not timely. Therefore, we find no error in the court's denial of the motion."). Nor does the Jencks Act provide a remedy of a new trial on an untimely motion. In short, Jonassen missed his chance to request Jencks statements by failing to do so during trial, and the district court did not err in refusing to grant his untimely motion.

Even if the notes qualified as Jencks Act material and had been requested in a timely fashion, failure to disclose them at the conclusion of E.J.'s direct examination cannot have been prejudicial. Jonassen has not explained how he could possibly have used any statement of hers to his advantage. It is

uncontested that E.J.'s story the night before trial was entirely inculpatory and consistent with her prior statements. The amnesiac nature of E.J.'s testimony made impeachment by Jonassen counterproductive. Simply put, E.J.'s effective refusal to testify was the best outcome Jonassen could have hoped for.

In sum, to raise the presumption in favor of an in camera inspection, Jonassen had to make both a timely request for Jencks Act material and a reasonable argument that if the notes said what he believed they said, they could possibly have been used to impeach E.J.'s testimony. He did neither.

AFFIRMED.