Filed 11/10/15  P. v. Montgomery CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,  Plaintiff and Respondent,  v.  EDWARD JEROME MONTGOMERY et al.,  Defendants and Appellants. | D068069  (Super. Ct. No. FSB1303197) |

APPEALS from judgments of the Superior Court of San Bernardino County, Victor R. Stull, Judge.  Affirmed.

John L. Staley, under appointment by the Court of Appeal, for Defendant and Appellant Edward Jerome Montgomery.

John L. Dodd, under appointment by the Court of Appeal, for Defendant and Appellant Dinnesha Perkins.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and James H. Flaherty III, for Plaintiff and Respondent.

INTRODUCTION

A jury convicted Edward Jerome Montgomery and Dinnesha Perkins of four counts of forgery (Pen. Code, § 470, subd. (d); counts 1, 3, 6 & 8),[1] four counts of procuring or offering a false or forged document (§ 115, subd. (a); counts 2, 4, 7 & 9), one count of second degree burglary (§ 459; count 5), and one count of conspiracy (§ 182, subd. (a)(1); count 10). As to all counts, the jury found true allegations the offense involved a pattern of related felony conduct causing a loss or taking of more than $500,000 (§ 186.11, subd. (a)(2)). As to count 2, the jury found true allegations Montgomery and Perkins intended to take, damage or destroy property with a value exceeding $200,000 (§ 12022.6, subd. (a)(2)). The trial court sentenced Montgomery to 14 years and eight months in prison and Perkins to six years and eight months in prison.

Montgomery and Perkins appeal, contending the court erred by allowing them to represent themselves. In addition, they contend the court erred by failing to instruct on the defense of mistake of law and by excluding evidence of their sovereign citizen beliefs. They further contend there was insufficient evidence to support their convictions for counts 5, 7, and 9 as well as the section 12022.6, subdivision (a)(2), and the section 186.11, subdivision (a)(2), enhancement findings. Perkins relatedly contends the court prejudicially erred in inaccurately instructing the jury on the requirements for the section 186.11, subdivision (a)(2), enhancement finding. Finally, Perkins contends the court was required to stay the sentences for her convictions for counts 4, 7, and 9 under section 654,

---

[1]     Further statutory references are also to the Penal Code unless otherwise stated.

2

and both Montgomery and Perkins contend the court was required to stay the sentences for their convictions for counts 1, 3, 5, 6 and 8 under this section. We are unpersuaded by these contentions and affirm the judgments.

BACKGROUND

In 2009, the victim purchased a home for $1.25 million. At the time, the San Bernardino County Assessor-Recorder-County Clerk (County) valued the home at $1.3 million. After purchasing the home, the victim placed no-trespassing signs in the home's windows. The victim did not know Montgomery or Perkins, he never transferred any interest in the home to anyone, and he never gave anyone permission to live in it.

In 2012, the victim received a letter indicating he had a limited time to object to some form of transaction involving the home. He went to the County and was told the letter had not been recorded. He subsequently met a police officer at the home to investigate.

When the officer arrived at the home, the officer noticed a car parked in the driveway. The car's license plate was fabricated and a piece of paper covered the car's vehicle identification number. The officer approached the front door and, before he could knock, Montgomery opened the door. Montgomery identified himself as "Ed Sog" and presented a photo identification purporting to be issued by the United States Department of Transportation. Montgomery told the officer he had recently purchased the home and lived there.

The officer briefly left and returned. When he returned, he knocked on the front door. Montgomery did not answer the door, but he and Perkins came out from around the

3

side of the home. Montgomery again claimed he had just purchased the home and handed the officer four notarized documents. The first notarized document, titled "Grant Deed," was signed by Perkins and purported to transfer the property from "Yaki Nations" to "Sovereign American Consulate." The document was recorded with the County against the victim's property in December 2011 (counts 1 and 2).

The second notarized document, also titled "Grant Deed," was signed by Perkins and purported to transfer the property from Yaki Nations to Sovereign American Consulate. The document was recorded with the County against the victim's property in January 2012 (counts 3 and 4). At the time the first and second notarized documents were recorded, the County valued the property at $975,000.

The third notarized document was titled "Quitclaim Deed." It was signed by Ed Sog in February 2012 and purported to transfer the property from Sovereign American Consulate to Ed Sog (counts 6 and 7) There is no evidence this document was recorded with the County.

The fourth notarized document was titled "Declaration of Acceptance." It was signed by Ed Sog in February 2012 and purported to accept transfer of the property to him. It further stated the transfer would stand "as a certainty" if it was "not properly challenged within sixty days (60), in a court of law" (counts 8 and 9). There is no evidence this document was recorded with the County.

The officer subsequently used a key provided by the victim to enter the home and garage. The officer found another car in the garage with a fabricated license plate. He saw the victim's no-trespassing signs inside the car.

4

A real estate title expert researched the title of the property back to 1854. He testified the two grant deeds recorded against the property were invalid because they were outside the proper chain of title. He further testified recording invalid deeds against a property clouds the property's title and prevents the property from being sold or refinanced. According to him, the property owner would likely need to file a civil quiet title action to get the invalid deeds removed from the public record, which could take years to finally resolve. Consequently, he testified the invalid deeds damaged the property owner in the amount of the assessed value of the property, or $975,000.

DISCUSSION

I

*Competency for Self-Representation*

A

During the proceedings below, Montgomery and Perkins consistently expressed certain untenable beliefs about the law applicable to them and their actions, which eventually prompted the court to declare a doubt as to their competency. Three psychologists attempted to evaluate them, but they did not cooperate with the evaluations.

1

The first psychologist who evaluated Montgomery opined Montgomery was obviously competent to stand trial. The psychologist based this opinion on the fact Montgomery was not receiving and did not have a history of receiving mental health treatment. In addition, Montgomery willingly engaged in conversation about matters unrelated to his case and did not display any obvious mental health issues. He also did

5

not show any indications of a psychosis or mood disorder, although he was possibly, but unlikely, experiencing delusions.

The second psychologist who evaluated Montgomery opined he was not competent to stand trial. In reaching this opinion, the psychologist reasoned: (1) the competency process is designed to protect defendants until they are proven guilty; (2) Montgomery refused to participate in a competency interview; and (3) he may possibly be experiencing delusions caused by a delusional disorder or paranoid schizophrenia.

The third psychologist who evaluated Montgomery indicated she could not assess his competency because of his refusal to participate in an interview.

2

The first psychologist who evaluated Perkins noted Perkins refused to answer any questions, but she seemed alert and clear throughout the interview. The psychologist also noted Perkins had no significant medical or psychosocial problems during her incarceration. Consequently, the psychologist concluded Perkins was competent to stand trial.

The second psychologist who evaluated Perkins indicated she could not assess Perkins's competency because of Perkins's refusal to participate in an interview.

The third psychologist who evaluated Perkins noted her refusal to cooperate and her lack of psychiatric treatment or irrational behavior while incarcerated. Nonetheless, he diagnosed her with delusional disorder, grandiose type, and provisionally diagnosed her with shared psychotic disorder because he believed she was showing signs of chronic

and well-entrenched delusional beliefs, which she apparently shared with Montgomery. Consequently, he concluded she was incompetent to stand trial.

3

Based on the psychologists' reports, the court found Montgomery and Perkins incompetent to stand trial and ordered treatment for them. They were both committed to a restoration of competency program.

A few months later, the court received a "Certificate of Restoration to Mental Competence" for each of them. Accompanying the certificates were reports discussing their competency. The reports indicated both Montgomery and Perkins subscribe to the views of the sovereign citizen movement[2] and the Black Hebrew Israelites, but neither of

---

[2] As one federal district court describes the movement, sovereign citizens "believe that our nation is made up of two types of people: those who are sovereign citizens by virtue of Article IV of the Constitution, and those who are 'corporate' or '14th Amendment' citizens by virtue of the ratification of the 14th Amendment. The arguments put forth by these groups are generally incoherent, legally, and vary greatly among different groups and different speakers within those groups. They all rely on snippets of 19th Century court opinions taken out of context, definitions from obsolete legal dictionaries and treatises, and misplaced interpretations of original intent. One of the more cogent-in the sense that it is readily followed-arguments is that there were no United States citizens prior to the ratification of the 14th Amendment. All Americans were merely citizens of their own state and owed no allegiance to the federal government. As a result of that amendment, however, Congress created a new type of citizen-one who now enjoyed privileges conferred by the federal government and in turn answered to that government.

"One of the ramifications of this belief is the dependent belief that, unless one specifically renounces his federal citizenship, he is not the type of citizen originally contemplated by the Constitution. And, in their view, the Constitution requires all federal office holders to be the original or sovereign type of citizen, a state citizen rather than a United States citizen. As a result, all federal officers are holding office illegally and their laws and rules are thus constitutionally suspect." (*United States v. Mitchell* (D.Md. 2005) 405 F.Supp.2d 602, 605.)

them had a history of mental illness or treatment. They also did not show symptoms of or receive treatment for a mental illness while they were in the restoration of competency program.

As to Perkins's competency, the report for her explained, "although [Perkins] expresses some uncommon religious and political ideas, these beliefs are not rooted in psychosis or delusion. Although she holds a strong conviction to these beliefs and can even be fairly inflexible in her thinking on these topics, her beliefs are consistent with the beliefs and practices of others within these cultures and subcultures." Based on this and the absence of any history, signs, or symptoms of mental illness, the psychologist who prepared the report indicated Perkins did not have any diagnosed clinical disorder, personality disorder, or intellectual disability.

The report for Montgomery similarly explained, "[A]t the time of admission, it was uncertain whether [Montgomery's] unconventional religious and political beliefs were culturally syntonic, a facet of his personality, or potentially delusional in nature. However, extensive observation combined with research into the beliefs and practices of members of the cultures and subcultures [Montgomery] identifies with revealed that his ideas and views are quite common within those groups … *and not reflective of psychosis or mental illness*." (Italics added.) Nonetheless, because Montgomery tended to be belligerent, grandiose, and easily offended, the psychologist who prepared the report diagnosed him with an unspecified personality disorder featuring narcissistic, antisocial, and paranoid traits.

After reviewing the reports, the court found both Montgomery and Perkins competent to stand trial and reinstated the criminal proceedings against them. The court subsequently granted their requests for self-representation after explaining to them the dangers and pitfalls of self-representation.[3]

B

Montgomery and Perkins contend they were denied their constitutional right to counsel because, while they may have been competent to stand trial, they were not competent to represent themselves. The record does not support their position.

"Defendants in criminal cases have a federal constitutional right to represent themselves. (*Faretta v. California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525] (*Faretta*).) In *Indiana v. Edwards* (2008) 554 U.S. 164 [171 L.Ed.2d 345, 128 S.Ct. 2379] (*Edwards*), however, the United States Supreme Court held that states may, but need not, deny self-representation to defendants who, although competent to stand trial, lack the mental health or capacity to represent themselves at trial—persons the court referred to as 'gray-area defendants.' (*Id*. at p. 174 [128 S.Ct. 2379].)" (*People v. Johnson* (2012) 53 Cal.4th 519, 523 (*Johnson*).) The *Edwards* rule applies in California. (*Johnson*, *supra*, at p. 523.) Thus, California courts have the discretion to deny self-representation to gray-area defendants. (*Id.* at p. 528.)

---

3    The court briefly revoked then reinstated Montgomery's self-represented status after Montgomery engaged in disruptive behavior in the courtroom.

Nonetheless, "[a] trial court need not routinely inquire into the mental competence of a defendant seeking self-representation. It needs to do so only if it is considering denying self-representation due to doubts about the defendant's mental competence." (*Johnson*, *supra*, 53 Cal.4th at p. 530.) "[T]he standard that trial courts considering exercising their discretion to deny self-representation should apply is simply whether the defendant suffers from a severe mental illness to the point where he or she cannot carry out the basic tasks needed to present the defense without the help of counsel." (*Ibid*.) "Trial courts must apply this standard cautiously. … Criminal defendants still generally have a Sixth Amendment right to represent themselves. Self-representation by defendants who wish it and validly waive counsel remains the norm and may not be denied lightly. A court may not deny self-representation merely because it believes the matter could be tried more efficiently, or even more fairly, with attorneys on both sides. Rather, it may deny self-representation only in those situations where *Edwards* permits it." (*Johnson*, at p. 531.)

"Because the *Edwards* rule is permissive, not mandatory, … *Edwards* 'does not support a claim of federal constitutional error in a case like the present one, in which defendant[s'] request to represent [themselves] was granted.' " (*Johnson*, *supra*, 53 Cal.4th at p. 527, quoting *People v. Taylor* (2009) 47 Cal.4th 850, 878.) Moreover, there is substantial evidence Perkins did not suffer from a mental illness. The report accompanying the certification of her competency indicated her sovereign citizen beliefs did not render her delusional. The report further indicated she had no other signs of

mental illness, she did not require mental health treatment, and she did not have a history of mental illness or mental health treatment.

Although the report accompanying the certification of Montgomery's competency indicated he had an unspecified personality disorder, there is substantial evidence the disorder was not severe. Like Perkins, Montgomery did not require mental health treatment and did not have a history of mental health treatment.

Even if Perkins and Montgomery did have severe mental illnesses, the record does not show they were unable to carry out the basic tasks needed to present their defense without the help of counsel. Rather, the record shows they fully participated in the trial by arguing pretrial motions, conducting voir dire, objecting to evidence, cross-examining witnesses, and making closing arguments. Perkins also gave an opening statement.

While Montgomery's conduct during trial was recalcitrant, recalcitrance that does not disrupt the proceedings; require gagging, shackling or removal from the courtroom; or make it impossible for the court to administer fair proceedings does not preclude defendants from representing themselves. (*United States v Johnson* (9th Cir. 2010) 610 F.3d 1138, 1144.) Montgomery's and Perkins's persistent adherence to sovereign citizen legal theories also did not preclude them from representing themselves. "[A]dherence to bizarre legal theories, whether they are 'sincerely held' or 'advanced only to annoy the other side,' does not 'imply mental instability or concrete intellect … so deficient that trial is impossible.' [Citations.] Criminal defendants often insist on asserting defenses with little basis in the law, particularly where, as here, there is substantial evidence of their guilt." (*United States v. Jonassen* (7th Cir. 2014) 759 F.3d 653, 660.) Accordingly,

11

Montgomery and Perkins have not established the court erred by permitting them to representing themselves at trial.

## II

### *Mistake of Law Instruction and Sovereign Citizen Evidence*

### A

Before trial, the People moved to exclude evidence of sovereign citizen beliefs or the sovereign citizen movement. The People also argued the court should not instruct the jury on the defense of mistake of law. The court granted the motion, finding the evidence was "likely to confuse the jury inasmuch as it is a misstatement of the law."

### B

Montgomery and Perkins contend the court erred by failing to instruct on the defense of mistake of law and by excluding the sovereign citizen evidence because their adherence to their sovereign citizen beliefs negates criminal intent. We are not persuaded by this contention.

### 1

Regarding the failure to instruct on the defense of mistake of law, " '[i]t is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case.' [Citations.] Included within this duty is the '… obligation to instruct on defenses, … and on the relationship of these defenses to the elements of the

12

charged offense …' where '… it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense.' " (*People v. Stewart* (1976) 16 Cal.3d 133, 140.)

"Mistake of law is a defense where the mistake negates the specific intent required for the crime." (*People v. Flora* (1991) 228 Cal.App.3d 662, 669.) "However, a mistake of law instruction is only appropriate where the evidence supports a reasonable inference that the claimed mistake was held in good faith." (*Ibid.*; *People v. Vineberg* (1981) 125 Cal.App.3d 127, 137.) " 'Whether a claim is advanced in good faith does not depend solely upon whether the claimant believes he was acting lawfully; the circumstances must be indicative of good faith.' " (*People v. Stewart*, *supra*, 16 Cal.3d at p. 140.)

In this case, Montgomery and Perkins cannot establish the requisite good faith for a mistake of law instruction. Courts have consistently rejected sovereign citizen type arguments as having no legal basis. (See *United States v. Benabe* (7th Cir. 2011) 654 F.3d 753, 767 [collecting cases].) Accordingly, any belief by Montgomery and Perkins that their individual sovereignty permitted their actions was unwarranted and in bad faith. (*People v. Rubin* (2008) 168 Cal.App.4th 1144, 1150 [" '[T]he law recognizes honest purpose, not dishonest ignorance of the law, as a defense to a charge of committing a crime requiring "specific intent." ' "].) "In the absence of some evidence from which it can be inferred that defendants' alleged belief in the lawfulness of their conduct was in good faith, the court was under no duty to instruct the jury that a good faith mistake of law constituted a defense to the action." (*People v. Vineberg* (1981) 125 Cal.App.3d 127, 138; and see *United States v. Svoboda* (6th Cir. 2011) 633 F.3d 479, 484 [good faith

13

mistake of law instruction is legally inapplicable and not required when "it is not based on [the defendant's] good faith belief about what the law provides, but rather [the defendant's] belief that the law does not validly constrain him"].)

## 2

Regarding the exclusion of sovereign citizen evidence, "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) Encompassed within this discretion is the discretion to exclude evidence of inapplicable law. (See *People v. Rippberger* (1991) 231 Cal.App.3d 1667, 1689-1690.) As mistake of law is not an applicable defense in this case, the sovereign citizen evidence was irrelevant and the court did not err in excluding it.

## III

### *Sufficiency of Evidence*

### A

Montgomery and Perkins contend there was insufficient evidence to support their conviction for burglary (count 5) and two of their convictions for procuring a false document (counts 7 and 9). They also contend there was insufficient evidence to support the section 12022.6, subdivision (a)(2), and the section 186.11, subdivision (a)(2), enhancement findings.

" ' "When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to

14

determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.] "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Citations.] "[I]t is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt." [Citation.] "In a case, such as the present one, based upon circumstantial evidence, we must decide whether the circumstances reasonably justify the findings of the trier of fact, but our opinion that the circumstances also might reasonably be reconciled with a contrary finding would not warrant reversal of the judgment." ' " (*People v. Foster* (2010) 50 Cal.4th 1301, 1348.)

B

1

To prove burglary, the prosecutor had to establish Montgomery and Perkins entered the victim's home with the intent to commit larceny or another felony. (§ 459; *People v. Foster*, *supra*, 50 Cal.4th at p. 1349.) The requisite intent must exist at the time of entry and may be inferred from the facts and circumstances. (*In re Leanna W.* (2004) 120 Cal.App.4th 735, 741.) Among the theories of culpability presented to the jury, the prosecutor argued Montgomery and Perkins committed burglary by entering the victim's home with the intent to commit conspiracy to commit forgery. There is substantial evidence to support this theory.

15

There is substantial evidence Montgomery and Perkins entered the victim's home because the evidence shows Montgomery came out of the front of the home the first time the police officer visited, both Montgomery and Perkins came out from the side of the home the second time the officer visited, and there were two cars with fabricated license plates parked at the home—one in the driveway and one in the garage. There is also substantial evidence Montgomery and Perkins intended to commit conspiracy to commit forgery at the time of entry because the victim's no-trespassing signs were found inside the car parked in the garage and, when the officer visited the second time, Montgomery produced, in Perkins's presence, the forged documents purportedly establishing Montgomery's ownership of the victim's home.

2

To prove the procuring a false document charge related to the quitclaim deed (count 7) and the procuring a false document charge related to the declaration of acceptance (count 9), the prosecution had to establish Montgomery and Perkins "knowingly procure[d] … any false … instrument to be filed, registered, or recorded in any public office within this state, which instrument, if genuine, might be filed, registered, or recorded under any law of this state or of the United States." (§ 115, subd. (a).) They contend the prosecution failed to meet its burden as to the quitclaim deed and the declaration of acceptance because neither document was recorded and the declaration of acceptance was not recordable.

However, a violation of section 115 does not require the false instrument to have been filed, registered, or recorded. (*People v. Garfield* (1985) 40 Cal.3d 192, 195;

16

*Generes v. Justice Court* (1980) 106 Cal.App.3d 678, 681-682; *People v. Gangemi* (1993) 13 Cal.App.4th 1790, 1795.) In addition, while section 115 does not apply to false instruments that are not entitled to be filed, registered, or recorded (*People v. Harrold* (1890) 84 Cal. 567, 569-570), both the quitclaim deed and the declaration of acceptance purport to be instruments affecting title to or possession of real property. Such documents, if genuine, are recordable. (Gov. Code, § 27280, subd. (a); and see Gov. Code, § 27201, subd. (a) [the county recorder may not refuse to record an instrument which relates to real property and which recording is authorized by statute based on the instrument's lack of legal sufficiency]; *People v. Baender* (1924) 68 Cal.App.49, 61 [section 115 applies " ' to various classes of instruments entitled under our law to be recorded, such as deeds, mortgages, etc. without any regard whatever, whether the particular instrument is defective in form or certification' "].) Therefore, there is substantial evidence the procurement of the quitclaim deed and the declaration of acceptance violated section 115.

3

Montgomery and Perkins contend there was insufficient evidence to support the section 12022.6, subdivision (a)(2), enhancement finding because there was insufficient evidence their actions resulted in a loss to the victim of more than $200,000.[4] They

---

4      Section 12022.6 provides in part: "(a) When any person takes, damages, or destroys any property in the commission or attempted commission of a felony, with the intent to cause that taking, damage, or destruction, the court shall impose an additional term as follows: [¶] . . . [¶] (2) If the loss exceeds two hundred thousand dollars ($200,000), the court, in addition and consecutive to the punishment prescribed for the

17

similarly contend there was insufficient evidence to support the section 186.11, subdivision (a)(2), enhancement finding because there was insufficient evidence their actions resulted in a loss to the victim of more than $500,000.[5]

However, the measure of damages for clouding title to real property is the assessed value of the property. (*People v. Denman* (2013) 218 Cal.App.4th 800, 811-813.) Here, the evidence showed the assessed value of the victim's home at the time Montgomery and Perkins recorded the grant deeds against it was $975,000. Accordingly, there is sufficient evidence their actions in recording the grant deeds caused the victim damage over $200,000 and over $500,000.

4

Montgomery and Perkins also contend there was insufficient evidence to support the section 186.11, subdivision (a)(2), enhancement finding because there was insufficient evidence they committed two or more related felonies involving a pattern of related felony conduct. For purposes of section 186.11, " 'pattern of related felony

felony or attempted felony of which the defendant has been convicted, shall impose an additional term of two years."

[5] Section 186.11 provides in part: "(a)(1) Any person who commits two or more related felonies, a material element of which is fraud or embezzlement, which involve a pattern of related felony conduct, and the pattern of related felony conduct involves the taking of, or results in the loss by another person or entity of, more than one hundred thousand dollars ($100,000), shall be punished, upon conviction of two or more felonies in a single criminal proceeding, in addition and consecutive to the punishment prescribed for the felony offenses of which he or she has been convicted, by an additional term of imprisonment in the state prison as specified in paragraph (2) or (3). . . . [¶] (2) If the pattern of related felony conduct involves the taking of, or results in the loss by another person or entity of, more than five hundred thousand dollars ($500,000), the additional term of punishment shall be two, three, or five years in the state prison."

conduct' means engaging in at least two felonies that have the same . . . victims . . . , and that are not isolated events."  (§ 186.11, subd. (a).)  " '[T]wo or more related felonies' means felonies committed . . . against the same victim on two or more separate occasions."  (*Ibid.*)

Here, the evidence showed Montgomery and Perkins recorded two different grant deeds against the same victim's home on two separate occasions.  Accordingly, there is substantial evidence Montgomery and Perkins committed two or more related felonies involving a pattern of related felony conduct within the meaning of section 186.11, subdivision (a)(2).

IV

*Section 186.11 Instruction*

A

As to the section 186.11, subdivision (a)(2) enhancement allegation, the court instructed the jury with a tailored version of CALCRIM No. 3221 as follows:

> "If you find either defendant guilty of the crimes charged in Counts 1 through 10, you must then decide whether the People have proved the additional allegation that the defendants engaged in a pattern of related felony conduct that involved the taking of or resulted in the loss by another person or entity of more than $500,000.00
>
> "To prove this allegation, the People must prove that:
>
> "1.  The defendant committed two or more related felonies, specifically Forgery, Procuring and Offering False or Forged Instrument, Burglary, and Conspiracy; [¶]  2.  Fraud or embezzlement was a material element of at least two related felonies committed by the defendant; [¶]  3.  The related felonies involved a pattern of related felony conduct; [¶] [and] [¶]  [4].  The pattern of

19

related felony conduct resulted in the loss by another person or entity of more than $500,000.00.

"A *pattern of related felony conduct* means engaging in at least two felonies that have the same or similar purpose, result, principals, victims, or methods of commission, or are otherwise interrelated by distinguishing characteristics, and that are not isolated events.

"*Related felonies* are felonies committed against two or more separate victims, or against the same victim on two or more separate occasions.

"Fraud is a material element of Forgery.

"The People have the burden of proving this allegation beyond a reasonable doubt.  If the People have not met this burden, you must find that this allegation has not been proved."

B

Perkins contends the court's instruction inconsistently defined "two or more related felonies" by first inaccurately indicating the phrase meant she had to have committed two of the specified felonies and then accurately stating the phrase meant she had to have committed related felonies against two or more separate victims, or against the same victim on two or more separate occasions.  She contends the inconsistency confused the jury and deprived her of due process of law.

" 'An appellate court reviews the wording of a jury instruction de novo and assesses whether the instruction accurately states the law.'  [Citation.]  ' " '[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.' " '  [Citation.]  Taking into account the instructions as a whole and the trial record, we

20

'determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' [Citation.] We presume that jurors are intelligent and capable of correctly understanding, correlating, applying, and following the court's instructions." (*People v. Acosta* (2014) 226 Cal.App.4th 108, 119) " ' "Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation." ' " (*People v. Riley* (2010) 185 Cal.App.4th 754, 767.)

In this case, the court's instruction considered as a whole and interpreted in favor of the judgment, informed the jury a section 186.11, subdivision (a)(2), enhancement requires the People to prove beyond a reasonable doubt Perkins committed two or more of the specified offenses against two or more separate victims, or against the same victim on two or more separate occasions. As this is a correct statement of the law, we conclude there is no reasonable likelihood the jury misapplied the instruction in an impermissible manner.

VI

*Section 654*

A

Montgomery's and Perkins's four forgery convictions (counts 1, 3, 6 and 8) and their four procuring a false document convictions (counts 2, 4, 7, 9) related to separate documents: the grant deed recorded in December 2011 (counts 1 and 2); the grant deed recorded in January 2012 (counts 3 and 4); the unrecorded quitclaim deed (counts 6 and

7); and the unrecorded declaration of acceptance (counts 8 and 9). Montgomery's and Perkins's burglary convictions (count 5) were based on their entry into the victim's home.

At the sentencing hearing, the court sentenced Montgomery as follows: the court designated count 2 as the base term and imposed a three-year sentence. For counts 1, 3, 4, 6, 7, 8 and 9, the court imposed consecutive eight-month sentences. For counts 5 and 10, the court imposed concurrent two-year sentences. The court also imposed a consecutive two-year sentence for the section 12022.6, subdivision (a)(2), and section 186.11, subdivision (a)(2) enhancements.

As to Perkins, the court designated count 2 as the base term and imposed a 16-month sentence. For count 1 and counts 3 through 6, the court imposed consecutive eight-month sentences. For counts 7 through 10, the court imposed concurrent two-year sentences; however, the court stayed the sentence for count 10. The court also imposed consecutive two-year sentences for the section 12022.6, subdivision (a)(2), and section 186.11, subdivision (a)(2) enhancements, but stayed the sentence for the latter enhancement.

B

Perkins contends section 654 required the court to stay her sentences for counts 1, 3 through 6, and 7 through 9 because these convictions involved an indivisible course of conduct. For the same reason, Montgomery contends section 654 required the court to stay his sentences for counts 1, 3, 5, 6 and 8.

### 1

As to the convictions for counts 4, 7, and 9 for procuring false documents, the court had no discretion to stay the sentences under section 654. Section 115, subdivision (d), provides: " 'For purposes of prosecution under this section, each act of procurement or of offering a false or forged instrument to be filed, registered, or recorded shall be considered a separately punishable offense.' This language demonstrates an express legislative intent to exclude section 115 from the penalty limitations of section 654. Thus, the Legislature has unmistakably authorized the imposition of separate penalties for each prohibited act even though they may be part of a continuous course of conduct and have the same objective." (*People v. Gangemi*, *supra*, 13 Cal.App.4th at p. 1800.)

### 2

As to the forgery (counts 1, 3, 6 and 8) and burglary (count 5) convictions, "[u]nder section 654, '[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision . . . .' The statute thus prohibits punishment for two crimes arising from a single, indivisible course of conduct. [Citation.]

"Whether a course of conduct is indivisible for purposes of section 654 depends on the intent and objective of the actor. [Citation.] If all the offenses are incidental to one objective, the defendant may be punished for any one of them, but not for more than one. [Citation.] On the other hand, if the evidence discloses that a defendant entertained multiple criminal objectives, which were independent of and not merely incidental to

23

each other, the trial court may impose punishment for independent violations committed in pursuit of each objective even though the violations shared common acts or were part of an otherwise indivisible course of conduct.  [Citation.]

"The question of whether section 654 is factually applicable to a given series of offenses is for the trial court, and the law gives the trial court broad latitude in making this determination.  [Citation.]  Its findings on this question must be upheld on appeal if there is any substantial evidence to support them.  [Citation.]  ' "We must 'view the evidence in a light most favorable to the respondent and presume in support of the [sentencing] order the existence of every fact the trier could reasonably deduce from the evidence.  [Citation.]' [Citation.]" [Citation.]' [Citation.]

" ' "Under section 654, 'a course of conduct divisible in time, although directed to one objective, may give rise to multiple violations and punishment.  [Citations.]' [Citations.]  This is particularly so where the offenses are temporally separated in such a way as to afford the defendant opportunity to reflect and to renew his or her intent before committing the next one, thereby aggravating the violation of public security or policy already undertaken." ' "  (*People v. DeVaughn* (2014) 227 Cal.App.4th 1092, 1112-1113.)

In this case, there is substantial evidence the forgery and burglary offenses were all temporally separated, which allowed Montgomery and Perkins an opportunity between the offenses to reflect upon and renew their intent to commit them.  " '[M]ultiple crimes are not one transaction where the defendant had a chance to reflect between offenses and each offense created a new risk of harm.' "  (*People v. DeVaughn*, *supra*, 227 Cal.App.4th at p. 1116.)  Accordingly, Montgomery and Perkins have not established

24

the court erred in failing to stay their sentences for their convictions in counts 1, 3, 5, 6 and 8 under section 654.

DISPOSITION

The judgments are affirmed.


McCONNELL, P. J.

WE CONCUR:


BENKE, J.


HUFFMAN, J.